437 F.3d 278
 NATIONAL ABORTION FEDERATION, Mark I. Evans, M.D., Carolyn Westhoff, M.D., Cassing Hammond, M.D., Marc Heller, M.D., Timothy R.B. Johnson, M.D., Stephen Chasen, M.D., and Gerson Weiss, M.D., Plaintiffs-Appellees,
v.
Alberto GONZALES,[1] in his capacity as Attorney General of the United States, along with his officers, agents, servants, employees, and successors in office, Defendants-Appellants.
Docket No. 04-5201-CV.
 United States Court of Appeals, Second Circuit.
 Argued: October 6, 2005.
 Decided: January 31, 2006.
 
 Elizabeth Wolstein, Asst. U.S. Atty., New York, NY (David N. Kelley, U.S. Atty., James L. Cott, Sean H. Lare, Sarah S. Normand, Asst. U.S. Attys., New York, NY, on the brief), for Defendants-Appellants.
 A. Stephen Hut, Jr., Washington, DC (Amy Kreiger Wigmore, Kimberly A. Parker, Wilmer Cutler Pickering, Hale and Dorr LLP, Washington DC; Elisabeth Benjamin, Anna Schissel, N.Y. Civil Liberties Union Foundation, New York, NY; Susan Talcott Camp, Louise Melling, Julie Sternberg, Reproductive Freedom Project, American Civil Liberties Union Foundation, New York, NY; Lorie A. Chaiten, The Roger Baldwin Foundation of ACLU, Inc., Chicago, IL, on the brief), for Plaintiffs-Appellees.
 (James Bopp, Jr., Thomas J. Marzen, Richard E. Coleson, Bopp, Coleson & Bostrom, Terre Haure, IN, for amicus curiae Horatio R. Storer Foundation, Inc., in support of Defendants-Appellants.)
 (Edward L. White III, Julie Shotzbarger, Thomas More Law Center, Ann Arbor, MI, for amicus curiae Thomas More Law Center, in support of Defendants-Appellants.)
 (Thomas Brejcha, Chicago, IL, Paul Benjamin Linton, Northbrook, IL, for amicus curiae Thomas More Society, Inc., in support of Defendants-Appellants.)
 (Phill Kline, Kansas State Atty. General, Topeka, KS, Nikolas T. Nikas, Denise M. Burke, Mailee R. Smith, Americans United for Life, Chicago, IL, for amicus curiae Attorney General of Kansas, in support of Defendants-Appellants.)
 (Steven W. Fitschen, The National Legal Foundation, Virginia Beach, VA, for amicus curiae The Nat'l. Legal Foundation, in support of Defendants-Appellants.)
 (Teresa Stanton Collett, University of St. Thomas School of Law, Minneapolis, MN, for amici curiae The Christian Medical and Dental Ass'n, and The Catholic Medical Ass'n, in support of Defendants-Appellants.)
 (Jay Alan Sekulow, Stuart J. Roth, Colby M. May, Walter M. Weber, Am. Ctr. for Law and Justice, Washington, DC; Vincent P. McCarthy, Ann-Louise Lohr, Kristina J. Wenberg, Am. Ctr. for Law and Justice, New Milford, CT, for amicus curiae The Am. Ctr. for Law and Justice and Various Members of Congress, in support of Defendants-Appellants.)
 (James Joseph Lynch, Jr., Brad Dacus, James Griffiths, The Pacific Justice Institute, Sacramento, CA, for amicus curiae Margie Riley and Laurette Elsburry, in support of Defendants-Appellants.)
 
 
 1
 (Pamela Harris, William R. Nifong, Pammela Quinn, O'Melveny & Myers, LLP, Washington, DC; Caroline R. Fredrickson, Blake M. Cornish, Belinda L. Bulger, NARAL Pro-Choice America Foundation, Washington, DC, for amicus curiae NARAL Pro-Choice America Foundation, in support of Plaintiffs-Appellees.)
 
 
 2
 (Eliot Spitzer, NY State Atty. General, Caitlin J. Halligan, Solicitor, General, Michelle Aronowitz, Deputy Solicitor General, Lisa Landau, Asst. Atty. General, New York, NY; Richard Blumenthal, Conn. State Atty. General, Hartford, Conn; William H. Sorrell, Vermont State Atty. General, Montpelier, VT, for amici curiae The States of New York, Connecticut and Vermont, in support of Plaintiffs-Appellees.)
 
 
 3
 (Kurt G. Calia, Gregory M. Lipper, Covington & Burling, Washington, DC; Martin E. Beeler, Michael J. Naft, Stephanie Yu, Covington & Burling, New York, NY; Susan Frietsche, Stacey I. Young, Women's Law Project, Pittsburgh, PA; David S. Cohen, Women's Law Project, Philadelphia, PA, for amici curiae Ass'n of Reproductive Health Professionals, et al., in support Plaintiffs-Appellees.)
 
 
 4
 (Kenneth Pasquale, Claude Szyfer, Dina Kolker, Stroock & Stroock & Lavan, LLP, New York, NY, for amicus curiae Statisticians Norman Henderson and Jeff Witmer, in support of Plaintiffs-Appellees.)
 
 
 5
 Before: WALKER, Chief Judge, NEWMAN, and STRAUB, Circuit Judges.
 
 
 6
 JON O. NEWMAN, Circuit Judge.
 
 
 7
 The issue on this appeal is whether the federal statute prohibiting an abortion method generally medically known as dilation and extraction ("D & X") and sometimes colloquially and in federal and state statutes called "partial birth abortion" is unconstitutional for lack of an exception permitting the procedure to be used to protect the health of a pregnant woman. The Government appeals from the August 27, 2004, judgment of the District Court for the Southern District of New York (Richard Conway Casey, District Judge) declaring the statute unconstitutional for lack of a health exception and enjoining its enforcement. See National Abortion Federation v. Ashcroft, 330 F.Supp.2d 436 (S.D.N.Y.2004) ("N.A.F. I"). Because the Supreme Court has held that a health exception is constitutionally required for any statute prohibiting a method of abortion whenever "substantial medical authority supports the proposition that banning a particular abortion procedure could endanger women's health," Stenberg v. Carhart, 530 U.S. 914, 938, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000), and because such substantial medical authority indisputably exists with respect to the D & X procedure, we agree with the District Court that the lack of a health exception renders the Act unconstitutional. We therefore affirm as to the declaration of the Act's unconstitutionality, but, in view of the Supreme Court's recent decision in Ayotte v. Planned Parenthood of Northern New England, ___ U.S. ___, 126 S.Ct. 961, ___ L.Ed.2d ___ (2006), defer a ruling as to the remedy pending receipt of supplemental briefs.
 
 Background
 
 8
 Abortion in general. Abortion is the killing of a fetus prior to birth. For centuries abortion has been a matter of intense controversy. Some consider abortion the illegitimate killing of a person. Others consider abortion a legitimate medical procedure used by a pregnant woman, in consultation with her doctor, to terminate a pregnancy prior to birth. Those on both sides of the controversy acknowledge that the fetus is a living organism, starting as a collection of cells just after conception and developing into a recognizable human form as the time for birth approaches. The destruction of a fetus is a distressing event, whether one views abortion as the killing of a person or a pregnant woman's personal choice concerning her body.
 
 
 9
 The challenged statute. In 2003, Congress enacted the statute at issue in this case, the Partial-Birth Abortion Ban Act of 2003 ("the Act"), Pub.L. No. 108-105 (2003) (codified at 18 U.S.C. § 1531).[2] The Act imposes criminal and civil penalties upon those who perform what the Act calls a "partial-birth abortion," id. § 1531(a), although the medical community usually calls the procedure "dilation and extraction" or "D & X."[3] The Act defines the procedure by identifying the extent to which a portion of the fetus has emerged from a woman's body in the course of a vaginal delivery prior to the killing of the fetus:
 
 
 10
 the term "partial-birth abortion" means an abortion in which the person performing the abortion— (A) deliberately and intentionally vaginally delivers a living fetus until, in the case of a head-first presentation, the entire fetal head is outside the body of the mother, or, in the case of breech presentation, any part of the fetal trunk past the navel is outside the body of the mother, for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus; and
 
 
 11
 (B) performs the overt act, other than completion of delivery, that kills the partially delivered living fetus[.]
 
 
 12
 18 U.S.C. § 1531(b)(1).
 
 
 13
 Accompanying the operative portions of the Act are 14 detailed findings, one of which, Finding 14, contains 15 sub-paragraphs. See Pub.L. No. 108-105, § 2, 117 Stat. 1201, 1201-06 (2003), reprinted in 18 U.S.C.A. § 1531, Historical and Statutory Notes, Congressional Findings (2005) ("Findings"). Especially relevant to the parties' contentions in this litigation are the following findings:
 
 
 14
 a partial-birth abortion . . . is never medically necessary. . . . Finding 1.
 
 
 15
 a partial-birth abortion is never necessary to preserve the health of a woman, poses significant health risks to a woman upon whom the procedure is performed and is outside the standard of medical care. Finding 5.
 
 
 16
 partial-birth abortion is never medically indicated to preserve the health of the mother; is in fact unrecognized as a valid abortion procedure by the mainstream medical community; [and] poses additional health risks to the mother. . . . Finding 14(O).
 
 
 17
 Other findings, discussed later in this opinion, concern the deference that Congress believes the courts are obliged to give to congressional findings.
 
 
 18
 The District Court decision. The District Court conducted a 16-day bench trial at which distinguished physicians gave fundamentally differing views concerning the D & X procedure and whether or not it might be needed in some circumstances to avoid health risks to the mother. Judge Casey's comprehensive opinion, including detailed findings of fact and conclusions of law, demonstrate the extreme thoughtfulness and sensitivity with which he approached his decision. Especially pertinent to the basic issue in this case—whether a health exception is constitutionally required—are two sets of findings made by the District Court. On the one hand, Judge Casey cast substantial doubt on much of the Plaintiffs' expert opinions. He found that "some" of the reasons advanced for using the D & X procedure were "incoherent," "other" reasons were "theoretical," and "many" reasons were "false." N.A.F. I, 330 F.Supp.2d at 479-80. On the other hand, accepting the probative force of other portions of the testimony and affidavits of the Plaintiffs' experts, he found
 
 
 19
 that a significant body of medical opinion—consisting of physicians who expressed their views at trial and before Congress, and medical organizations representing experts in the field—holds that D & E [dilation and evacuation] has safety advantages over induction and that D & X has some safety advantages (however hypothetical and unsubstantiated by scientific evidence) over D & E for some women in some circumstances.
 
 
 20
 Id. at 480. Moreover, after summarizing a division of medical opinion on various aspects of the use and consequences of the D & X procedure, he concluded:
 
 
 21
 Although the Court finds that the Government's experts offered testimony that was highly credible and reasoned, the Court cannot ignore that the evidence indicates a division of medical opinion exists about the necessity of D & X to preserve women's health. There is no consensus that D & X is never medically necessary, but there is a significant body of medical opinion that holds the contrary. The evidence indicates that the same disagreement among experts found by the Supreme Court in Stenberg existed throughout the time that Congress was considering the legislation, despite Congress's findings to the contrary.
 
 
 22
 Id. at 482.
 
 
 23
 Based on the existence of a "significant body of medical opinion" supporting the view that the D & X procedure is sometimes necessary to avoid a risk to a woman's health, Judge Casey declared the Act unconstitutional and permanently enjoined its enforcement. See N.A.F. I, 330 F.Supp.2d at 493.
 
 Discussion
 I. The Constitutionality of the Act
 
 24
 Since 1973, the Supreme Court has ruled that some degree of constitutional protection surrounds a woman's right to choose to have an abortion. See Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). In 1992 the Court modified some aspects of its original analysis in Roe. See Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) ("Casey"). As explicated in the plurality opinion of Justices O'Connor, Kennedy, and Souter, the Court "reject[ed] the rigid trimester framework of Roe v. Wade," id. at 878, 112 S.Ct. 2791; adopted an "undue burden analysis," id.; "reaffirm[ed]" the "central holding" of Roe that "[r]egardless of whether exceptions are made for particular circumstances, a State may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability," id. at 879, 112 S.Ct. 2791; and "reaffirm[ed] Roe's holding that `subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother,'" id. (quoting Roe, 410 U.S. at 164-65, 93 S.Ct. 705) (emphasis added).
 
 
 25
 The state regulations considered in Casey did not concern methods of performing an abortion. Instead, they concerned non-technique matters: assuring the woman's informed consent, id. at 881-87, 112 S.Ct. 2791 (upheld); spousal notification, id. at 887-98, 112 S.Ct. 2791 (invalidated); parental consent for women under 18, id. at 899-900, 112 S.Ct. 2791 (upheld providing adequate medical bypass exists); and recordkeeping and reporting, id. at 900-01, 112 S.Ct. 2791 (upheld except for reporting of the woman's reason for not notifying her husband).
 
 
 26
 In a series of previous decisions, however, the Supreme Court had considered and invalidated state regulations prohibiting or unduly regulating abortion procedures. See Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 75-79, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (saline amniocentesis); Colautti v. Franklin, 439 U.S. 379, 397-401, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) (standard-of-care provision understood to prohibit various procedures without adequate concern for health of the woman); Thornburgh v. American College of Obstetricians and Gynecologists, 476 U.S. 747, 768-69, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986) (same).
 
 
 27
 Against this background of precedent, the Supreme Court in 2000 decided the case most pertinent to the pending appeal, Stenberg v. Carhart, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). Stenberg was a challenge to the constitutionality of Nebraska's prohibition of partial-birth abortion. The Nebraska statute defined partial birth abortion as:
 
 
 28
 an abortion procedure in which the person performing the abortion partially delivers vaginally a living unborn child before killing the unborn child and completing the delivery.
 
 
 29
 Neb.Rev.Stat. Ann. § 28-326(9) (Supp. 1999). The statute contained an exception to its prohibition where necessary to preserve the life of the mother, id. § 28-328(1), but made no exception for preserving the health of the mother, see Stenberg, 530 U.S. at 930, 120 S.Ct. 2597.
 
 
 30
 The Supreme Court ruled the Nebraska statute unconstitutional "for at least two independent reasons"—(1) the lack of "any exception `for the preservation of the . . . health of the mother,'" id. (quoting Casey, 505 U.S. at 879, 112 S.Ct. 2791), and (2) the imposition of "`an undue burden on a woman's ability' to choose a D & E abortion, thereby unduly burdening the right to choose abortion itself," id. (quoting Casey, 505 U.S. at 874, 112 S.Ct. 2791). With respect to the requirement of a health exception, Stenberg explained both when such an exception is required and what it must minimally contain:
 
 
 31
 [W]here substantial medical authority supports the proposition that banning a particular abortion procedure could endanger women's health, Casey requires the statute to include a health exception when the procedure is "`necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.'"
 
 
 32
 Id. at 938, 112 S.Ct. 2791 (quoting Casey, 505 U.S. at 879, 112 S.Ct. 2791, in turn quoting Roe, 410 U.S. at 165, 93 S.Ct. 705). In addition to citing Casey and Roe, the Court grounded the constitutional requirement of a health exception on its prior decisions on abortion procedures in Thornburgh, Colautti, and Danforth.[4] The Court recently restated the constitutional requirement of a health exception in government regulation of abortions in Ayotte, a case concerning parental notification prior to an abortion for a minor, see Ayotte, 126 S.Ct. at 967 ("[O]ur precedents hold[] that a State may not restrict access to abortions that are necessary, in appropriate medical judgment, for preservation of the life or health of the mother.") (internal quotation marks omitted) (emphasis added).
 
 
 33
 Having identified the circumstance under which a statute prohibiting an abortion technique constitutionally requires a health exception, the Court concluded that the record before the district court in Stenberg demonstrated the existence of the requisite "substantial medical authority support[ing] the proposition that banning a particular abortion procedure could endanger women's health." Id. The Court recognized that medical opinion on the matter was divided, but stated:
 
 
 34
 Casey's words "appropriate medical judgment" must embody the judicial need to tolerate responsible differences of medical opinion—differences of a sort that the American Medical Association and American College of Obstetricians and Gynecologists' statements together indicate are present here.
 
 
 35
 [T]he division of medical opinion about the matter at most means uncertainty, a factor that signals the presence of risk, not its absence. That division here involves highly qualified knowledgeable experts on both sides of the issue. Where a significant body of medical opinion believes a procedure may bring with it greater safety for some patients and explains the medical reasons supporting that view, we cannot say that the presence of a different view by itself provides the contrary. Rather, the uncertainty means a significant likelihood that those who believe that D & X is a safer abortion method in certain circumstances may turn out to be right. If so, then the absence of a health exception will place women at an unnecessary risk of tragic health consequences. If they are wrong, the exception will simply turn out to have been unnecessary.
 
 
 36
 Id. at 937, 112 S.Ct. 2791.
 
 
 37
 Thus, the issue here, as it was in Stenberg, is whether there is "substantial medical authority" supporting the proposition that prohibiting the D & X procedure "could endanger women's health." 530 U.S. at 938, 120 S.Ct. 2597. Unquestionably such "substantial medical authority" exists. As the District Court recounted, it is abundantly revealed in the evidence presented both to the trial court in this litigation and to the Congress in the hearings that preceded the Act, some of which is referenced in the margin.[5]
 
 
 38
 We recognize that Congress has made several pertinent findings in support of the Act, including a finding that D & X is never needed to avoid risk to a woman's health. The parties vigorously contest the deference this Court should give these findings. The Government contends, citing Turner Broadcasting System, Inc. v. FCC, 520 U.S. 180, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997), that we should defer to the findings as long as they are supported by substantial evidence, see Brief for Defendant-Appellant at 37-39, and further maintains that sufficient substantial evidence is reflected in the congressional hearings preceding the Act, see id. at 45-56, and confirmed by the evidence before the District Court, see id. at 56-87. The Plaintiffs-Appellees contend that Turner does not apply to a case governed by Stenberg, see Brief for Plaintiffs-Appellees at 35-36, nor to a statute curtailing fundamental rights, see id. at 36-37, and that the congressional findings are "patently unreasonable," id. at 43. Pointing to evidence in both the congressional hearing and District Court trial records indicating that the D & X procedure is sometimes necessary to protect a woman's health, the Plaintiffs-Appellees contend that judicial deference is not owed to a finding that purports to reach the conclusion that the procedure is never needed to protect her health. They call our attention, as did the District Court, see N.A.F. I, 330 F.Supp.2d at 485, to the following excerpt from an opinion then-judge Clarence Thomas wrote for the District of Columbia Circuit:
 
 
 39
 We know of no support . . . for the proposition that if the constitutionality of a statute depends in part on the existence of certain facts, a court may not review a legislature's judgment that the facts exist. If a legislature could make a statute constitutional simply by "finding" that black is white or freedom, slavery, judicial review would be an elaborate farce. At least since Marbury v. Madison that has not been the law.
 
 
 40
 Lamprecht v. FCC, 958 F.2d 382, 392 n. 2 (D.C.Cir.1992) (citation omitted).
 
 
 41
 We also recognize that the congressional findings include several paragraphs in which Congress asserted its own prerogative to make findings and marshaled case law in support of judicial deference to such findings. See Findings 8-12. Congress "found" that
 
 
 42
 the United States Congress is entitled to reach its own factual finding—findings that the Supreme Court accords great deference—and to enact legislation based upon these findings as long as it seeks to pursue a legitimate interest within the scope of the Constitution, and draws reasonable inferences based upon substantial evidence.
 
 Id. Finding 8. Congress also found that
 
 43
 [t]here exists substantial record evidence upon which Congress has reached its conclusion that a ban on partial-birth abortion is not required to contain a "health" exception, because the facts indicate that a partial-birth abortion is never necessary to preserve the health of a woman, poses serious risks to a woman's health, and lies outside the standard of medical care.
 
 
 44
 Id. Finding 13.
 
 
 45
 The parties' opposing contentions concerning deference to the congressional findings and the forcefully expressed views on the matter by the Congress itself raise issues of the utmost gravity as to the proper role of a court considering a constitutional challenge to an act of Congress. However we might resolve those issues in other contexts where Supreme Court precedents are less clear, we conclude that Roe, Casey, and especially Stenberg provide authoritative guidance that we are bound to follow. Stenberg does not leave it to a legislature (state or federal) to make a finding as to whether a statute prohibiting an abortion procedure constitutionally requires a health exception. On the contrary, Stenberg leaves it to the challenger of the statute, i.e., the proponent of a required health exception, to point to evidence of "substantial medical authority" that supports the view that the procedure might sometimes be necessary to avoid risk to a woman's health.
 
 
 46
 In recognizing that Stenberg has left the task of marshaling substantial medical authority in support of a health exception to litigants who challenge a prohibition of an abortion procedure that lacks a health exception, we intend no disrespect to Congress for making its own finding on the matter. We are making no judgment with respect to the validity of the congressional findings nor assessing whether those findings are supported by substantial evidence. Instead, bound by Supreme Court precedent, we are limiting our inquiry to determining whether the constitutional test for a required health exception, as enunciated by the Supreme Court, has been met.
 
 
 47
 We recognize the strong feelings legitimately held as to whether the D & X procedure should ever be used and whether a statute regulating that procedure should include an exception for risks to the mother's health. The question for us, however, is not whether the procedure should be allowed or prohibited as a matter of medical or broader social policy, nor whether if prohibited, a health exception is advisable. Our question, as an intermediate appellate court required to apply relevant constitutional precepts set forth by the Supreme Court, is whether a statute prohibiting the D & X procedure is constitutionally required to have a health exception when substantial medical opinion indicates that the procedure might sometimes be required to avoid risks to the mother's health if an alternative procedure is used. Taking our instruction from the Supreme Court's decision in Stenberg, we answer that question in the affirmative. We also conclude, on a court record and a congressional hearing record even more compelling than the record on which the Supreme Court ruled in Stenberg, that substantial medical opinion does support the view that the procedure might sometimes be necessary to avoid risks to the mother's health if an alternative procedure is used. The result we are obliged to reach is that the statute is unconstitutional for lack of a health exception. All of the other courts that have considered statutes prohibiting the D & X procedure have ruled them unconstitutional for lack of a health exception. See Reproductive Health Services of Planned Parenthood of the St. Louis Region v. Nixon, 429 F.3d 803 (8th Cir.2005) (ruling Missouri's "Infant's Protection Act" unconstitutional for lack of a health exception); Carhart v. Gonzales, 413 F.3d 791 (8th Cir.2005) (ruling the federal Act unconstitutional for lack of a health exception), pet. for cert. filed, No. 05-380, Sept. 23, 2005 74 U.S.L.W 3213 (2005); Richmond Medical Center for Women v. Hicks, 409 F.3d 619, 622-26 (4th Cir.2005) (ruling Virginia statute prohibiting "partial birth infanticide" unconstitutional for lack of a health exception); Planned Parenthood Federation of America v. Ashcroft, 320 F.Supp.2d 957 (N.D.Cal.2004) (ruling the federal Act unconstitutional for lack of a health exception); WomanCare of Southfield, P.C. v. Granholm, 143 F.Supp.2d 849, 855 (E.D.Mich.2001) (ruling Michigan's "Infant Protection Act" unconstitutional for lack of a health exception); Summit Medical Assocs., P.C. v. Siegelman, 130 F.Supp.2d 1307, 1314 (M.D.Ala. 2001) (ruling Alabama's "Partial-Birth Abortion Ban Act of 1997" unconstitutional for lack of a health exception); Daniel v. Underwood, 102 F.Supp.2d 680, 684-85 (S.D.W.Va.2000) (ruling West Virginia's "Women's Access to Health Care Act" unconstitutional for lack of a health exception).
 
 
 48
 We have considered the possibility that the governing force of Stenberg might be altered by the fact that in prohibiting the D & X procedure, Congress identified a concern that does not appear to have been explicitly part of the motivation that prompted the Nebraska statute challenged in Stenberg—an effort to maintain a clear distinction between permissible abortion and impermissible infanticide.[6] The congressional findings explicitly include the following:
 
 
 49
 The gruesome nature of the partial-birth abortion procedure and its disturbing similarity to the killing of a new-born infant promotes a complete disregard for infant human life that can only be countered by a prohibition of the procedure.
 
 Finding 14(L)
 
 50
 Congress . . . finds that partial-birth abortion . . . blurs the line between abortion and infanticide in the killing of a partially-born child just inches from birth . . . .
 
 
 51
 Finding 14(O).
 
 
 52
 For two reasons, we do not believe that an asserted interest in not "blur[ring] the line between abortion and infanticide" can alter the binding force of Stenberg. First, that interest was urged upon the Court in the brief on behalf of Nebraska, see note 6, supra, and was explicitly called to the Court's attention in the dissenting opinions of Justices Kennedy, see Stenberg, 530 U.S. at 961, 963, 120 S.Ct. 2597, and Thomas, see id. at 982, 983, 995 n. 12, 1002, 1006, 1007, 1020, 120 S.Ct. 2597.
 
 
 53
 Second, Congress has provided explicit guidance on where to draw the line against infanticide. Congress has defined "child" to include "every infant member of the species homo sapiens who is born alive," 1 U.S.C. § 8(a), and has defined "born alive" to mean "the complete expulsion or extraction from his or her mother of that member, at any stage of development, who after such expulsion or extraction breathes or has a beating heart, pulsation of the umbilical cord, or definite movement of voluntary muscles," id. § 8(b) (emphasis added). A fetus aborted using the D & X procedure is not "born alive" and is not a "child" as so defined.
 
 II. The Appropriate Remedy
 
 54
 Having agreed with the District Court that the Act is unconstitutional for lack of a health exception, we turn to the issue of the appropriate remedy. The District Court declared the Act unconstitutional and enjoined its enforcement. N.A.F. I, 330 F.Supp.2d at 493. In view of the Supreme Court's recent decision in Ayotte, the issue of remedy requires further consideration.
 
 
 55
 In Ayotte, the Supreme Court considered a New Hampshire statute requiring, subject to some exceptions, parental notification before a doctor could perform an abortion on a minor. The district court had declared the statute unconstitutional for lack of an exception for the mother's health and enjoined its enforcement. See Planned Parenthood of Northern New England v. Heed, 296 F.Supp.2d 59, 65-68 (D.N.H.2003). The First Circuit affirmed. See Planned Parenthood of Northern New England v. Heed, 390 F.3d 53, 65 (1st Cir.2004).
 
 
 56
 The Supreme Court, after restating its view that a statute regulating abortion constitutionally requires an exception for the protection of the mother's health, see Ayotte, 126 S.Ct. at 967, considered the issue of remedy separately from the unconstitutionality of the statute. First, the Court noted that it was "understandable" that the trial and appellate courts had invalidated the statute in its entirety "for we, too, have previously invalidated an abortion statute in its entirety because of the same constitutional flaw," id. at 969, referring to the Court's ruling in Stenberg, concerning the Nebraska statute prohibiting so-called partial birth abortions.[7]
 
 
 57
 Then, pointing out that the parties in Stenberg "did not ask for, and we did not contemplate, relief more finely drawn," Ayotte, 126 S.Ct. at 969, and that the parties in Ayotte had recognized "the possibility of a more modest remedy" than total invalidation of the New Hampshire statute, id., the Court considered whether the lack of a health exception required total or only partial invalidation of the statute. The Court noted its preference "to enjoin only the unconstitutional applications of a statute while leaving other applications in force or to sever its problematic portions while leaving the remainder intact." Id. at 967 (citations omitted). The Court also emphasized the need for restraint in rewriting laws to conform to constitutional requirements, see id. at 968, and stated that "the touchstone for any decision about remedy is legislative intent," id. The Court concluded, "After finding an application or portion of a statute unconstitutional, we must ask: Would the legislature have preferred what is left of its statute to no statute at all?" Id. Deeming that inquiry an "open question" in Ayotte, see id. at 969, the Court remanded "for the lower courts to determine legislative intent in the first instance," id.
 
 
 58
 In the pending case, it is similarly entirely understandable that Judge Casey, guided by the Supreme Court's opinion in Stenberg, would declare the Act unconstitutional and enjoin its enforcement. Although the Appellants do not appear to have been as prescient as the New Hampshire Attorney General in suggesting the possibility of a remedy less than total invalidation of the Act, we conclude that, with the guidance of Ayotte at hand, all parties should now be afforded an opportunity to advise us as to their views concerning an appropriate remedy. We also conclude that the parties will be aided in framing their submissions concerning the appropriate remedy by the issuance of this opinion, setting forth our ruling that the Act is unconstitutional for lack of an exception to protect the mother's health.
 
 
 59
 Finally, we recognize that whether we need to rule on the Appellees' contentions that the Act imposes an "undue burden," within the meaning of Casey, on a woman's right to choose an abortion and is void for vagueness and suffers from unconstitutional overbreadth will likely depend on our decision as to the appropriate remedy, because invalidation of the statute in its entirety would make it unnecessary to consider the Appellees' other claims of unconstitutionality. We will, therefore, not consider these claims until we make a determination concerning the remedy.
 
 Conclusion
 
 60
 Accordingly, we rule that the Act is unconstitutional for lack of a health exception; we defer a ruling as to the appropriate remedy; we direct the parties to submit within 30 days supplemental letter briefs, not to exceed 25 double-spaced pages, setting forth their views concerning the appropriate remedy in light of the ruling we have made; and we direct the Clerk to file this opinion forthwith.
 
 
 
 Notes:
 
 
 [1]
 Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Alberto R. Gonzales is automatically substituted for former Attorney General John Ashcroft as the respondent in this case
 
 
 [2]
 The evolution of the Act in Congress, starting with hearings in 1995, is meticulously recounted in the District Court's opinionSee N.A.F. I, 330 F.Supp.2d at 443-52.
 
 
 [3]
 As the District Court noted, the Physicians' Ad Hoc Coalition for Truth has stated that "there is `no agreement, even among proponents of [the prohibited procedure] as to what to call it.'"N.A.F. I, 330 F.Supp.2d at 440 n. 2 (quoting Hearings Before the Subcommittee on the Constitution of the House Committee on the Judiciary, 107th Cong. 236 (letter from Physicians' Ad Hoc Coalition for Truth to the American College of Obstetricians and Gynecologists)).
 
 
 [4]
 Stenberg also cited Doe v. Bolton, 410 U.S. 179, 197, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), Stenberg, 530 U.S. at 931, 120 S.Ct. 2597, but the cited page concerns an invalidated requirement of a hospital's abortion committee, not a particular abortion procedure.
 
 
 [5]
 Among the evidence recounted by the District Court are the following:
 [N]ine medical associations, including ACOG [American College of Obstetrics and Gynecology], CMA [California Medical Association], PRCH [Physicians for Reproductive Choice and Health], AMWA [American Medical Women's Association, Inc.], and APHA [American Public Health Association] opposed the Act because, they stated, D & X provides safety advantages for some women.
 N.A.F. I, 330 F.Supp.2d at 488.
 Obstetricians and gynecologists who have performed D & X abortions, such as Drs. Creinin, Koplik, Scommegna, and Darney, submitted letters regarding their views on the need for a health exception. (See, e.g., 141 Cong. Rec. H11610 (daily ed. Nov. 1, 1995) (letter from Dr. Creinin); id. (letter from Dr. Koplik); 141 Cong. Rec. S17892 (daily ed. Dec. 4, 1995) (letter from Dr. Scommegna); 149 Cong. Rec. S3600 (statement of Dr. Darney).)
 Id. at 488-89.
 [A]s proof of its determination that the mainstream medical community disapproves of the procedure, Congress found that medical schools do not instruct students on partial-birth abortions. Act, § 2(14)(B), 117 Stat. 1204. Testimony at trial adduced that, contrary to Congress's finding, the procedure is taught at leading medical schools, such as New York University, Columbia, Cornell, Northwestern, and Albert Einstein College of Medicine. (See, e.g., Tr. 1786:23-24, 1812:8-13 (Lockwood); Tr. 752:20-753:25, 897:10-898:10 (Westhoff); Tr. 1556:19-25 (Chasen); Tr. 1046:3-11 (Frederiksen); Tr. 2150:3-24 (Sprang).)
 Id. at 490.
 Congress concluded that D & X is a disfavored medical procedure that is not embraced by the medical community, "particularly among physicians who routinely perform other abortion procedures." Act, §§ 2(2), 13, 14(O), 117 Stat. at 1201, 1203-04, 1206. The face of the congressional record rebuts this finding. First, the record includes the statements of nine associations, including ACOG and APHA, which opposed the ban because they believe that the procedure offers safety advantages and might be medically necessary in the presence of certain maternal-health conditions and fetal anomalies. (See, e.g., 149 Cong. Rec. S12921 (statement of ACOG); 149 Cong. Rec. S11596-97 (statement of APHA).) Second, the congressional record contains letters from numerous individual physicians—whose practices include performing abortions—stating that maternal health would be jeopardized under the Act. (See, e.g., November 1995 Hearing at 103 (testimony of Dr. Robinson); November 1995 Hearing at 248 (statement of Dr. Hern); 149 Cong. Rec. S3600 (statement of Dr. Darney); March 2003 Hearing at 191-95 (statement of Dr. Davis).) Third, medical textbooks, which were included in the congressional record, discuss D & X as a medically recognized means to terminate a pregnancy. (See, e.g., June 1995 Hearing at 48-62 (excerpt from Williams Obstetrics).)
 
 Id.
 
 
 
 [6]
 The State's brief inStenberg contended that the State had a compelling interest in "erecting a barrier to infanticide," Stenberg, Brief of Petitioners at 48-49, but cited no explicit reference to this concern in the legislative materials.
 
 
 [7]
 The Court's ruling inStenberg appears not to have been quite as comprehensive as Ayotte characterized it. The district court in Stenberg explicitly considered whether to determine the facial validity of the Nebraska statute or to confine its consideration to an "as applied" challenge, see Carhart v. Stenberg, 11 F.Supp.2d 1099, 1119-20 (D.Neb.1998), and decided that it was unnecessary to decide whether the statute was facially invalid, see id. at 1120. Consequently, the district court's order declared the statute unconstitutional only "[a]s applied to Dr. Carhart, his patients and others who are similarly situated," id. at 1132, and enjoined the defendants from enforcing the statute only "against [Dr. Carhart], his patients, and others who are similarly situated to the extent the law has been declared unconstitutional," id. The Eight Circuit affirmed the judgment of the district court, see Carhart v. Stenberg, 192 F.3d 1142, 1152 (8th Cir.1999), although stating that it was considering "a challenge to the facial validity of an abortion regulation," id. at 1149. The Supreme Court affirmed the judgment of the court of appeals. See Stenberg, 530 U.S. at 946, 120 S.Ct. 2597.
 
 
 
 61
 JOHN M. WALKER, JR., Chief Judge, concurring.
 
 
 62
 Stenberg v. Carhart, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000), effectively held that the deeply disturbing — and morally offensive — destruction of the life of a partially born child cannot be banned by a legislature without an exception for the mother's health (as determined by her doctor). It did so, despite the existence of other established methods of terminating such late-term pregnancies, upon the basis that some medical opinion exists to the effect that partial-birth abortion is safer for some women in some circumstances.
 
 
 63
 The underlying facts before us, consisting principally of a range of medical opinions, are not materially different from those before the Court in Stenberg; thus it is my duty to follow that precedent no matter how personally distasteful the fulfillment of that duty may be. I join Judge Newman's carefully-crafted opinion accordingly. I write separately, however, to express certain concerns with the Supreme Court's abortion jurisprudence generally and with Stenberg in particular.
 
 
 64
 I can think of no other field of law that has been subject to such sweeping constitutionalization as the field of abortion. Under the Supreme Court's current jurisprudence, the legislature is all but foreclosed from setting policy regulating the practice; instead, federal courts must give their constitutional blessing to nearly every increment of social regulation that touches upon abortion — from gathering statistics about its frequency to establishing informed-consent standards that govern its use. In the process, the Supreme Court has sanctioned a mode of constitutional analysis in abortion cases that has removed the lower courts from their traditional role as arbiter of specific factual disputes and instead asked them to exercise their "gravest and most delicate duty," the invalidation of a statute, Blodgett v. Holden, 275 U.S. 142, 148, 276 U.S. 594, 48 S.Ct. 105, 72 L.Ed. 206 (1927) (Holmes, J.), based upon a speculative showing that a statute might, in some yet-to-be-presented circumstance, have an unconstitutional application.
 
 
 65
 The Supreme Court's decision in Stenberg exemplifies these larger problems. Faced with a statute that sought to ban a single method of abortion that many Americans — probably most Americans — find exceedingly offensive on moral grounds, the Court determined that, even though other methods of abortion are safe, a state cannot ban the procedure as long as it might be significantly safer for some unproven number of women. See Stenberg, 530 U.S. at 934-38, 120 S.Ct. 2597. The Stenberg Court's holding is flawed in at least three respects: (1) it equates the denial of a potential health benefit (in the eyes of some doctors) with the imposition of a health risk and, in the process, promotes marginal safety above all other values, however worthy they may be; (2) it endorses a rule that permits the lower courts to hold a statute facially invalid upon a speculative showing of harm, even if, in the vast majority of cases, the statute's application would not lead to an unconstitutional result; and (3) it establishes an evidentiary standard that all but removes the legislature from the field of abortion policy. I address each point in turn.
 
 
 66
 1. The Stenberg Court, By Equating The Denial Of A Potential Health Benefit With The Imposition Of A Health Risk, Has Promoted Marginal Safety Above All Other Values.
 
 
 67
 In Stenberg, the Court held that under the "governing standard" articulated in Casey, a statute must include "an exception `where it is necessary, in appropriate medical judgment for the preservation of the life or health of the mother.'" Id. at 931, 112 S.Ct. 2791 (quoting Planned Parenthood v. Casey, 505 U.S. 833, 879, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)). The Court went on to explain that the requirement of a health exception is not limited to situations where the pregnancy itself endangers women's health, but also includes situations where a statute that operates to preclude a particular method of abortion would pose a "significant health risk." Id. As the Court explained, "Our cases have repeatedly invalidated statutes that in the process of regulating the methods of abortion, imposed significant health risks." Id.; see also id. (explaining that "a State cannot subject women's health to significant risks . . . where state regulations force women to use riskier methods of abortion" (emphasis added)). Based on these standards, the majority had little trouble concluding that "a statute that altogether forbids D & X creates a significant health risk." Id. at 938, 112 S.Ct. 2791.
 
 
 68
 In reaching this conclusion, however, the Court never identified why a statute that altogether forbids D & X creates a significant health risk; it simply noted that, while other methods of abortion are "`safe,'" some doctors believe that "the D & X method [is] significantly safer in certain circumstances." Id. at 934, 112 S.Ct. 2791 (second emphasis in the original). Of course, this only establishes that a statute that altogether forbids D & X would deny some women a potential health benefit over an objectively "safe" baseline; it does not establish that such a statute would pose a constitutionally significant health risk.
 
 
 69
 By conceding that in all circumstances there are objectively "safe" alternatives to the D & X procedure, the Stenberg Court announced a rule that places relative safety above all other values. See Stenberg, 530 U.S. at 934-35, 120 S.Ct. 2597. Under the Court's Logic, other available procedures might be deemed safe — even safer than natural childbirth — but if there is a marginally safer alternative in the opinion of some credible professionals, the state must make it available, no matter how morally repugnant society deems that method. This fundamental flaw — holding that the denial of a marginal health benefit constitutes the imposition of a significant health risk — permeates the Stenberg decision and renders it at odds with Casey. I cannot square the undue burden standard of Casey with a holding that, while conceding the existence of alternative safe procedures, denies legislatures the ability to promote important interests above the conferral upon some citizens of a marginal health benefit. Certainly, nothing in Casey, which Stenberg purports to apply, compels such a result. Indeed, Casey expressly held that even though Roe v. Wade spoke of the state's "important and legitimate interest in potential life," 410 U.S. 113, 163, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), "[t]hat portion of the decision in Roe [had] been given too little acknowledgment and implementation by the Court in its subsequent cases," Casey, 505 U.S. at 871, 112 S.Ct. 2791. And the decision went further still. Casey also established that the government has a legitimate interest in informing a woman about the "consequences to the fetus" during an abortion, "even when those consequences have no direct relation to [a woman's] health," id. at 882, 112 S.Ct. 2791, and even though the 24-hour waiting-period associated with those informed-consent provisions could at least arguably impose an increased health risk in some situations, see id. at 886-87, 112 S.Ct. 2791. Simply put, Casey permitted the state to advance important governmental interests, provided that in promoting those interests, it does not deprive women of their right to terminate a pregnancy by way of an objectively safe abortion procedure.[8] Cf. id. at 875, 112 S.Ct. 2791 (stating that, prior to Casey, the Court erred in "striking down . . . abortion regulations which in no real sense deprived women of [their] ultimate decision"). After Stenberg, lower courts can only guess as to how the Casey standard should be applied.[9]
 
 
 70
 2. The Stenberg Court Endorsed A Rule That Permits The Lower Courts To Hold A Statute Facially Invalid Upon A Speculative Showing Of Harm, Even If, In The Vast Majority Of Cases, The Statute's Application Would Not Lead To An Unconstitutional Result.
 
 
 71
 At least since the landmark decision of Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), federal courts have traditionally reviewed the constitutionality of legislation as applied to particular facts on a case-by-case basis. Under this mode of judicial review, a litigant is required to make a showing that a statute will work an unconstitutional result as applied to the facts and circumstances associated with that litigant's conduct. Once a court determines that a statute will work an unconstitutional result, it will typically prevent the enforcement of that statute against the challenger.
 
 
 72
 In certain circumstances, courts are also permitted to declare a statute facially unconstitutional and invalidate the challenged legislation in all of its applications. The standard for a "facial challenge," however, is typically much more onerous: "the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Even under this "difficult" standard, id., a facial challenge remains a departure from a court's traditional role as arbiter of a specific factual dispute. Because a facial challenge requires a litigant to show that a statute is incapable of a single valid application, it necessarily requires a court to speculate about potential applications of the challenged statute to hypothetical situations. This, in turn, requires a relaxing of many of the familiar requirements associated with Article III of the Constitution, which limits the federal judiciary's authority to specific "Cases or Controversies." As the Supreme Court has long recognized, a federal court "has no jurisdiction to pronounce any statute . . . void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies." Liverpool, N.Y. & Philadelphia S.S. Co. v. Comm'rs of Emigration, 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899 (1885).
 
 
 73
 Facial challenges are tolerated, in part, because they save judicial resources; they permit a single injured party to assert the claims of all future litigants by making a showing that each time that a statute is enforced, it will necessarily yield an unconstitutional result. And because a litigant is required to show that a statute has no valid applications before a court can declare that statute unconstitutional in its entirety, a facial challenge provides no more relief than would be obtained over an exhaustive series of as-applied challenges.
 
 
 74
 When courts depart from the Salerno standard, however, they find themselves even further removed from their core function — resolving specific factual disputes between parties. If, for example, a court were permitted to hold a statute facially invalid based upon a finding that a "large fraction" of its applications would yield an unconstitutional result, that court would face an extraordinarily difficult inquiry: first, it would have to "consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation," Barrows v. Jackson, 346 U.S. 249, 256, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), and then it would have to determine whether the statute worked an unconstitutional result in a "large fraction" of these hypothetical situations. Moreover, if a court were permitted to declare a statute facially invalid based on a showing less than Salerno's "no set of circumstances" standard, its relief might extend to situations where the statute's application would not raise constitutional concerns.
 
 
 75
 As it stands now, however, the Supreme Court appears to have adopted the "large fraction" standard (perhaps modified by Stenberg to mean a "not-so-large fraction" standard) for those who seek to challenge an abortion regulation as facially unconstitutional. In Casey, the challengers to a spousal-notification provision did not have to show that there were "no set of circumstances" under which the provision would be valid; they simply had to show that, in the situations where the provision was "relevant," it worked an unconstitutional result in a "large fraction of cases." See Casey, 505 U.S. at 895, 112 S.Ct. 2791 (stating that "in a large fraction of cases in which [the challenged provision] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion"); cf. id. at 893, 894 (stating that the challenged provision was likely to prevent a "significant number of women" from seeking abortions). And "in Stenberg v. Carhart, without so much as a mention of Salerno, the Court held invalid, in a pre-enforcement challenge, an abortion statute that might have been construed . . . to have at least some proper applications." A Woman's Choice — East Side Women's Clinic v. Newman, 305 F.3d 684, 687 (7th Cir.2002) (citation omitted); see also Stenberg, 530 U.S. at 934, 120 S.Ct. 2597 (stating that, in a challenge to a ban on an "infrequently used abortion procedure," the "procedure's relative rarity . . . is not highly relevant"). As a result of these decisions, at least "seven circuits have concluded that Salerno does not govern facial challenges to abortion regulations." Richmond Med. Ctr. for Women v. Hicks, 409 F.3d 619, 627 (4th Cir.2005) (collecting cases); see also Sabri v. United States, 541 U.S. 600, 609-10, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004) (stating in dicta that the Supreme Court has recognized "the validity of facial attacks alleging overbreadth (though not necessarily using that term) in" the field of "abortion") (citing Stenberg, 530 U.S. at 938-46, 120 S.Ct. 2597).
 
 
 76
 There may be adequate reasons for suspending Salerno's "no set of circumstances" test in the field of abortion — including possibly a concern that, under the Salerno standard, it would be difficult for a woman to bring an as-applied challenge under exigent circumstances. But the Supreme Court has never told us what has happened to the Salerno doctrine in the abortion context;[10] it has never balanced the jurisprudential and administrative considerations associated with jettisoning Salerno against whatever medical concerns might militate in favor of a modified standard of proof. More importantly, the Court has never considered whether Casey or Stenberg struck the appropriate balance. Perhaps a better standard can be articulated — one that requires a regulation's challenger to make an affirmative showing of proof regarding the way in which women will be adversely affected by the challenged abortion regulation. Instead, the Court has sanctioned a mode of constitutional analysis that permits the lower courts to invalidate an abortion regulation based upon a speculative showing that the challenged provision might work an unconstitutional result. See Stenberg, 530 U.S. at 937, 120 S.Ct. 2597 (stating that "[w]here a significant body of medical opinion believes a procedure may bring with it greater safety for some patients and explains that view, we cannot say that the presence of a different view by itself proves the contrary" (emphasis added)); but cf. Broadrick v. Oklahoma, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973) (explaining that, under the First Amendment doctrine of overbreadth, unless the unconstitutional reach of a statute is "not only real, but substantial," the fact that a statute "may deter protected speech to some unknown extent" cannot "justify invalidating a statute on its face and so prohibiting a State from enforcing the statute against conduct that is admittedly within its power to proscribe" (emphasis added)).
 
 
 77
 The Supreme Court recently had an opportunity to address the continued vitality of Salerno in the abortion context. See Planned Parenthood v. Heed, 390 F.3d 53, 57-58 (1st Cir.2004), vacated, Ayotte v. Planned Parenthood, ___ U.S. ___, 126 S.Ct. 961, ___ L.Ed.2d ___ (2006). The Court, however, chose not to address the most controversial issue before it — the quantum of proof necessary to bring a facial challenge to an abortion regulation. Instead, the Court simply held that, even where a challenger has brought forth evidence sufficient to satisfy the undefined standard of proof for facial challenges to abortion regulations, the lower courts should refrain from granting "the most blunt remedy" — permanently enjoining a regulation in its entirety — when a more limited remedy might suffice. Ayotte, 126 S.Ct. at 969. Still an open question is the appropriate standard of proof necessary to sustain a facial challenge to an abortion regulation.
 
 
 78
 Without the guidance of the Supreme Court on the question of proof, today we declare, under the binding precedent of Stenberg, that a statute is unconstitutional because there is evidence that, in some circumstances, its application might deny some women access to a marginally safer procedure. The Supreme Court needs to inform us how much evidence is required to sustain such challenges. Until it does, the lower courts will continue to labor under a standard that is both unclear and difficult to apply with any certainty, while the legislatures will lack sufficient constitutional guidance on the standard that will be used to challenge their enactments.
 
 
 79
 3. The Stenberg Court Established An Impossible Evidentiary Standard In An Area Where Legislatures Should Be Permitted To Set Policy.
 
 
 80
 Based upon my review of the record both before Congress and the district court, Congress had before it substantial evidence that, even if the D & X procedure is wholly prohibited, a woman can obtain a safe abortion in almost every conceivable situation. But that is not the standard under Stenberg. Under Stenberg, the government must establish that the D & X procedure is never necessary, in appropriate medical judgment, to preserve the health of the mother. Stenberg, 530 U.S. at 932, 936-38, 120 S.Ct. 2597. Not only must the government establish a negative, but it also must establish that proponents of the D & X procedure are not exercising responsible medical judgment when they conclude that D & X might be necessary, in some conceivable situation, based on the estimated health risks and benefits. See id. at 937, 120 S.Ct. 2597. This is a virtually insurmountable evidentiary hurdle.
 
 
 81
 The standard announced in Stenberg is rendered all the more questionable when one considers that the constitutional provision that the Court invoked to strike down Nebraska's statute — the Due Process Clause of the Fourteenth Amendment — has generally been interpreted as a restraint on arbitrary government action. The Supreme Court should tell us what it is about abortion cases that necessitates an exception to this rule.
 
 
 82
 In my opinion, where the government still makes available to women an objectively safe and convenient means to terminate a pregnancy, it is inappropriate for a court to preclude the legislature from making a reasonable policy judgment about a particular procedure. As Justice Kennedy explained in his dissenting opinion in Stenberg, the legislature has always been empowered to make difficult policy choices in the field of medicine, even in the face of substantial disagreement over the virtues of a particular medical procedure. Id. at 970, 120 S.Ct. 2597 (Kennedy, J., dissenting). Indeed, "it is precisely where such disagreement exists that legislatures have been afforded the widest latitude." Id. (quoting Kansas v. Hendricks, 521 U.S. 346, 360 n. 3, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997)).
 
 
 83
 * * * * * *
 
 
 84
 In the end, I cannot escape the conclusion that, in these abortion cases, the federal courts have been transformed into a sort of super regulatory agency — a role for which courts are institutionally ill-suited and one that is divorced from accepted norms of constitutional adjudication. In today's case, we are compelled by a precedent to invalidate a statute that bans a morally repugnant practice, not because it poses a significant health risk, but because its application might deny some unproven number of women a marginal health benefit. Is it too much to hope for a better approach to the law of abortion — one that accommodates the reasonable policy judgments of Congress and the state legislatures without departing from established, generally applicable, tenets of constitutional law?
 
 
 
 Notes:
 
 
 [8]
 As Justice O'Connor recognized in her dissenting opinion inThornburgh v. American College of Obstetricians and Gynecologists, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), overruled in part and superseded by Planned Parenthood v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), an abortion regulation does not necessarily impose an undue burden where it requires a "trade-off" between the relative health benefits associated with a desired abortion procedure and the important governmental interests associated with an alternative procedure. See Thornburgh, 476 U.S. at 832, 106 S.Ct. 2169 (O'Connor, J., dissenting) (stating that, absent the imposition of a health risk rising to the level of a "real and identifiable one," where a statute promotes a "trade-off" between alternative abortions procedures, "there is little possibility that a woman's abortion decision will be unduly burdened by risks falling below that threshold").
 
 
 [9]
 If it were not forStenberg, I believe this case would be governed by the thoughtful analysis that Judge Straub articulates in his dissenting opinion. See infra. In my opinion, Judge Straub carefully demonstrates why banning partial-birth abortion would not impose an undue burden on a woman's right to choose to terminate an unwanted pregnancy — at least, as that standard was defined in Casey. For at least three principal reasons, however, I believe his analysis is foreclosed by Stenberg.
 First, I believe that Judge Straub overstates the Supreme Court's reliance on the district court's findings in Stenberg. The Stenberg Court did not limit itself to the record on appeal; it also considered the conclusions of other federal district courts, Stenberg, 530 U.S. at 932-33, 120 S.Ct. 2597 (noting that, with one exception, the federal trial courts that heard evidence on partial-birth abortion concluded that D & X may be the best or most appropriate procedure in some circumstances); statements in medical textbooks, id. at 927, 120 S.Ct. 2597, medical journals, id. at 929, 120 S.Ct. 2597, and amicus curiae briefs, id. at 933, 120 S.Ct. 2597; and evidence before Congress, id. at 929-30, 120 S.Ct. 2597, 935; see also id. at 960, 966, 120 S.Ct. 2597 (Kennedy, J., dissenting); id. at 987 & n. 5, 993-96 & nn.11 & 13, 1016-17 & n. 23, 120 S.Ct. 2597 (Thomas, J., dissenting).
 Second, the evidence has not changed since the Supreme Court decided Stenberg — only the conclusions that Congress decided to draw from that evidence. After Stenberg was decided, but before Congress held any new hearings on partial-birth abortion, Representative Chabot introduced House Bill 4965, the legislative precursor to the Partial-Birth Abortion Ban Act of 2003, complete with the same detailed factual findings that were ultimately enacted into law. Compare The Partial-Birth Abortion Ban Act of 2003, Pub.L. No. 108-105, § 2, 117 Stat. 1201, 1201-06 (2003), with Partial-Birth Abortion Ban Act of 2002, H.R. 4965, 107th Cong. § 2 (2002) (introduced June 19, 2002). When House Bill 4965 was introduced, with its findings already in place, Congress had not considered any new evidence. When it did hold hearings, the same divisions of medical opinion over whether D & X is safer than other procedures were presented, which is all that Stenberg required to ban the procedure.
 Third, I do not believe that this case can be distinguished from Stenberg based upon the government's interest in holding the line between infanticide and abortion. As the government was required to concede at oral argument, the Act applies both before and after a fetus becomes viable such that it would survive outside the womb. Absent a provision that limits the Act's reach to viable fetuses, it is difficult to rest the Act's constitutionality upon an interest in maintaining a distinction between infanticide and abortion. In any event, the Stenberg Court was aware of the government's interest in maintaining such a distinction, see, e.g., Stenberg, 530 U.S. at 963, 120 S.Ct. 2597 (Kennedy, J., dissenting), but apparently the Court did not find this interest sufficient to justify a complete ban on partial-birth abortions.
 
 
 [10]
 As Judge Easterbrook explained:
 When the Justices themselves disregard rather than overrule a decision — as the majority did in Stenberg, and the plurality did in Casey — they put courts of appeals in a pickle. We cannot follow Saleno without departing from the approach taken in both Stenberg and Casey; yet we cannot disregard Salerno without departing from the principle that only an express overruling relieves an inferior court of the duty to follow decisions on the books.
 Choice-East Side Women's Clinic, 305 F.3d at 687.
 
 
 
 85
 CHESTER J. STRAUB, Circuit Judge, dissenting.
 
 
 86
 I respectfully dissent. In passing the Partial-Birth Abortion Ban Act of 2003 (the "Act"), Congress sought to prohibit the "gruesome and inhuman procedure" of delivering a fetus into this world only to destroy it as it reaches the threshold of birth. Pub.L. No. 108-105, § 2(1), 117 Stat. 1201, 1201, codified at 18 U.S.C. § 1531. This procedure, Congress found, blurs the line between abortion and infanticide and distorts the ethical duties of physicians. Id. § 2(14)(G), (J), (O), 117 Stat. at 1205-06. Moreover, Congress specifically found that the "partial-birth abortion" procedure — generally referred to as "Dilation and Extraction" or the "D & X" procedure — is "never medically necessary" and in fact "poses serious risks to a woman's health." Id. § 2(13), 117 Stat. at 1203-04. It further found that there is "no credible medical evidence" that the procedure is safer than other abortion procedures. Id. § 2(14)(B), 117 Stat. at 1204.
 
 
 87
 The District Court, in this case, agreed with Congress in many respects. After hearing all of the evidence, the District Court found that the government's expert witnesses had "reasonably and effectively refuted Plaintiffs' proffered bases for the opinion that D & X has safety advantages over other second-trimester abortion procedures." Nat'l Abortion Fed'n v. Ashcroft, 330 F.Supp.2d 436, 479 (S.D.N.Y. 2004) (N.A.F.). The District Court found that many of the plaintiffs' proffered bases are not "credible; rather they are theoretical or false." Id. at 480.
 
 
 88
 Nonetheless, the District Court held the Act unconstitutional upon finding a "division of medical opinion," or a "disagreement in the medical community," about the purported safety advantages of D & X. See id. at 481-82. According to the District Court, Stenberg v. Carhart, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000), renders irrelevant Congress's findings — and, indeed, the District Court's own findings — on the medical necessity of the D & X procedure. The District Court stated that the question is not whether "Congress was reasonable in its finding that D & X is never medically necessary. Instead, the relevant inquiry . . . is whether Congress reasonably determined, based on substantial evidence, that there is no significant body of medical opinion believing the procedure to have safety advantages for some women." N.A.F., 330 F.Supp.2d at 488.
 
 
 89
 In my view, the District Court's fundamental error — which is reflected in the majority's opinion as well — is to collapse the inquiry into whether a "division of medical opinion" exists and thereby discard any role for congressional findings about the actual necessity of the procedure. Stenberg requires a health exception "where substantial medical authority supports the proposition that banning a particular abortion procedure could endanger women's health." Stenberg, 530 U.S. at 938, 120 S.Ct. 2597. While a "division of medical opinion" may factor into the presence or absence of "substantial medical authority," there must be more to the inquiry than simply counting heads. The medical opinion in favor of a particular view — in this case, the advantages of D & X — must be supported by credible medical explanations and evidence. Whether such medical evidence exists is a factual issue, and I believe we owe deference to Congress's factual findings, supported by the District Court's own findings, that D & X is never medically necessary and that there is no "credible medical evidence" to the contrary. See Partial-Birth Abortion Ban Act, § 2(1), (13), (14)(B), 117 Stat. at 1201, 1203-04. At least some consideration of and deference to congressional findings is appropriate in the area of abortion, just as it would be on factual matters affecting economic or environmental regulation, campaign finance reform, or the necessity of civil rights measures to remedy discrimination.
 
 
 90
 In addition, unlike the Nebraska statute at issue in Stenberg, the Act specifically proscribes the destruction of a living fetus that is substantially outside the body of its mother. The Nebraska statute prohibited a partial-birth abortion that could have occurred completely within the body of the mother. Congress recognized the controlling nature of the Supreme Court's decision in Stenberg, and created a more narrow prohibition preventing the destruction of a living fetus that is substantially "outside the body of the mother." 18 U.S.C. § 1531(b)(1)(A). Moreover, the Act's prohibition was tailored to address Congress's particular concern that a "partial-birth abortion" "blurs the line between abortion and infanticide." Partial-Birth Abortion Act, § 2(14)(O), 117 Stat. at 1206. This fundamental distinction requires us to reevaluate whether Stenberg necessarily controls the disposition of this case. Because I do not believe that a woman's right to terminate her pregnancy under Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), or Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), extends to the destruction of a child that is substantially outside of her body, and that the State has a compelling interest in drawing a bright line between abortion and infanticide, I am of the opinion that Stenberg is not dispositive of this case.
 
 I.
 
 91
 I begin by addressing Stenberg's "substantial medical authority" standard in order to determine whether the existence of "substantial medical authority" supporting the necessity of D & X is a factual issue and, if so, whether Congress's findings on the issue are entitled to deference.
 
 A.
 
 92
 The Supreme Court explained in Stenberg that a statute must include "an exception `where it is necessary, in appropriate medical judgment for the preservation of the life or health of the mother.'" Stenberg, 530 U.S. at 931, 120 S.Ct. 2597 (quoting Casey, 505 U.S. at 879, 112 S.Ct. 2791). This "governing standard" prohibits the State from "endanger[ing] a woman's health when it regulates the methods of abortion." Id. at 931, 120 S.Ct. 2597. This requirement is not limited to situations where the pregnancy itself endangers the woman's health, but also includes "where state regulations force women to use riskier methods of abortion." Id. As the Court stated, "Our cases have repeatedly invalidated statutes that in the process of regulating the methods of abortion, imposed significant health risks." Id.
 
 
 93
 The Court then considered Nebraska's argument that "the law d[id] not require a health exception unless there is a need for such an exception." Id. The Court did not dispute the logic of Nebraska's argument but rather held that the state had failed as a factual matter: "The problem for Nebraska is that the parties strongly contested this factual question in the trial court below; and the findings and evidence support Dr. Carhart." Id. at 931 — 32, 120 S.Ct. 2597 (emphasis added). The Court concluded that "[t]he State fails to demonstrate that banning D & X without a health exception may not create significant health risks for women, because the record shows that significant medical authority supports the proposition that in some circumstances, D & X would be the safest procedure." Id. at 932, 120 S.Ct. 2597.
 
 
 94
 The Stenberg majority arrived at this conclusion by examining four "medically related evidentiary circumstances":
 
 
 95
 The upshot is a District Court finding that D & X significantly obviates health risks in certain circumstances, a highly plausible record-based explanation of why that might be so, a division of opinion among some medical experts over whether D & X is generally safer, and an absence of controlled medical studies that would help answer these medical questions.
 
 
 96
 Id. 936-37, 120 S.Ct. 2597. Given the presence of these four "medically related evidentiary circumstances," the Court determined that the statute required a health exception. Id. at 937, 120 S.Ct. 2597. "In sum," the Court explained, "Nebraska has not convinced us that a health exception is never medically necessary to preserve the health of women." Id. at 937-38, 120 S.Ct. 2597 (internal quotations marks omitted). The Stenberg majority then went on to state what has since been interpreted as the "rule" arising out of the case: "[W]here substantial medical authority supports the proposition that banning a particular abortion procedure could endanger women's health, Casey requires the statute to include a health exception when the procedure is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." Id. (internal quotation marks omitted); Carhart v. Gonzales, 413 F.3d 791, 796 (8th Cir.2005) (focusing on "substantial medical authority" as the standard for determining the constitutionality of the federal Act), petition for cert. filed, No. 05-380 (Sept. 23, 2005).
 
 
 97
 The District Court held that the presence of only one of the four evidentiary circumstances — a division of medical authority — requires the statute to contain a health exception. As noted above, the District Court generally agreed that the safety advantages of D & X proffered by the plaintiffs were hypothetical and unsubstantiated, but it found that there is nonetheless "a division of medical authority over the issue of whether D & X is generally safer than the alternatives. The Supreme Court has held that when there is such a division of medical opinion, a health exception is constitutionally required." N.A.F., 330 F.Supp.2d at 491. This is not the correct standard. In my view, "substantial medical authority" must be determined in light of all four medically related evidentiary circumstances and not simply equivocated to "division of medical opinion," "however hypothetical or unsubstantiated by scientific evidence" that opinion may be. See id. at 491.
 
 
 98
 The plaintiffs interpret "substantial medical authority" to mean any medical opinion contending that D & X is necessary to protect women's health no matter how unsupported or false. To the contrary, Casey's reference to "appropriate medical judgment" means that courts must tolerate "responsible differences of medical opinion." Stenberg, 530 U.S. at 937, 120 S.Ct. 2597 (emphasis added). Stenberg is premised on the district court's belief in Dr. Carhart's testimony and its finding that "D & X may be the best or most appropriate procedure in a particular circumstance to preserve the health of a woman." Id. at 932, 120 S.Ct. 2597. Indeed, two of the "medically related evidentiary circumstances" were "a district court finding that D & X significantly obviates health risks in certain circumstances" and "a highly plausible record-based explanation of why that might be so." Id. at 936-37, 120 S.Ct. 2597.[11] Although the phrase "appropriate medical judgment" must, according to Stenberg, "embody the judicial need to tolerate responsible differences of medical opinion," id. at 937, 120 S.Ct. 2597, there is no suggestion that there is a judicial need to tolerate medical opinions that are "incoherent," "theoretical," "unsubstantiated by scientific evidence," and "false," N.A.F., 330 F.Supp.2d at 480. To the contrary, Stenberg states clearly that not only must a "significant body of medical opinion believe[ ] a procedure may bring with it greater safety for some patients," it must also "explain[ ] the medical reasons supporting that view." Stenberg, 530 U.S. at 937, 120 S.Ct. 2597. Here, the plaintiffs were unable to "explain[] the medical reasons supporting" the proposition that D & X is medically necessary. N.A.F., 330 F.Supp.2d at 479 (finding that the government "refuted Plaintiffs' proffered bases for the opinion that D & X has safety advantages over other second-trimester abortion procedures"). Medical opinions that both Congress and the District Court rejected as false, cannot constitute "appropriate medical judgment."
 
 
 99
 In sum, under my reading of Stenberg, the ultimate issue remains the necessity of D & X in preserving women's health, to be determined based on substantial medical authority. See Stenberg, 530 U.S. at 937-38, 120 S.Ct. 2597. Where there is a division of medical opinion and credible medical explanations supporting both sides of that division, that level of uncertainty indicates a risk to women and requires a health exception. See id. Stenberg, however, did not set down an immutable ban on the passing of a statute banning D & X without a health exception or suggest that the division of medical opinion alone could require such an exception.[12] Cf. Carhart, 413 F.3d at 801 ("This is not to say, however, that because the Supreme Court concluded that `substantial medical authority' supported the need for a health exception in 2000, legislatures are forever constitutionally barred from enacting partial-birth abortion bans."). Overall, while the necessity of D & X is an issue bounded by legal considerations, the quality and credibility of medical evidence supporting the D & X procedure is still a factual one, and, for the reasons explained below, I would find that Congress is owed deference in its determination that no credible medical evidence — and by implication, no truly substantial medical authority — supports the medical necessity of the D & X procedure.
 
 B.
 
 100
 With respect to Congress's findings, the District Court inquired into whether "Congress reasonably determined, based on substantial evidence, that there is no significant body of medical opinion believing the [D & X] procedure to have safety advantages for some women." N.A.F., 330 F.Supp.2d at 488. The District Court declared that Congress's findings on the issue of a consensus were not reasonable, but as explained above, I do not believe that this is the correct inquiry. The majority, meanwhile, expresses that it "intend[s] no disrespect to Congress for making its own finding on the matter," and it makes "no judgment with respect to the validity of the congressional findings." Ante at 287. Instead, the majority believes that Stenberg renders Congress's findings irrelevant, and that the only inquiry is whether the challenger of the statute can demonstrate "substantial medical authority" — i.e., some medical opinion — in support of D & X's safety advantages.
 
 
 101
 While I appreciate that the majority intends no disrespect toward Congress, discarding the relevance of Congress's findings altogether is hardly more respectful than reviewing their validity. Moreover, Stenberg did not discuss the impact of legislative findings, as the Nebraska legislature did not make any findings on the necessity of D & X. See Act of June 9, 1997, §§ 1-3, 1997 Neb. Laws 23 (1997) (amending Neb.Rev.Stat. §§ 28-235 to -236). Thus, Stenberg should not be interpreted to preclude Congress from conducting its own analysis of whether a health exception is necessary. Now that Congress has made findings, I believe that we are obligated to consider and afford appropriate deference to those findings in determining whether the four evidentiary circumstances creating "substantial medical authority" exist in this case.
 
 1.
 
 102
 A court's determination concerning the risks inherent in a medical procedure is not an interpretation of the Constitution to which Congress must defer. Whether D & X is necessary to protect women's health is a question of fact that cannot be decided in a single litigation. As Stenberg left open the possibility that given a different factual record a ban proscribing D & X could be constitutional, Congress was entitled to examine the relevant medical evidence on the subject. Whether D & X is a necessary procedure to protect women's health is a matter of "legislative fact." See N.A.F., 330 F.Supp.2d at 485 n. 30; accord Carhart, 413 F.3d at 799; Hope Clinic v. Ryan, 195 F.3d 857, 884 (7th Cir.1999) (en banc) (Posner, J., dissenting), vacated and remanded, 530 U.S. 1271, 120 S.Ct. 2738, 147 L.Ed.2d 1001 (2000). Legislative facts are generally described as "those which have relevance to legal reasoning and the lawmaking process, whether in the formation of a legal principle or ruling by a judge or court or in the enactment of a legislative body" as distinguished from "adjudicatory facts" which "are simply the facts of the particular case." Fed.R.Evid. 201, advisory committee's note, quoted in Landell v. Sorrell, 382 F.3d 91, 203 (2d Cir.2004) (Winter, J., dissenting), cert. granted, ___ U.S. ___, 126 S.Ct. 35, 162 L.Ed.2d 933 (2005). Legislative facts found by a lower court are not subject to a clearly erroneous standard of review but may be reviewed de novo by an appellate court. See Lockhart v. McCree, 476 U.S. 162, 168 n. 3, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (stating that it was unpersuaded that legislative facts were subject to clearly erroneous review). An appellate court, however, may not disregard legislative facts found by a legislature in the exercise of its lawmaking power:
 
 
 103
 [T]he government's burden of justifying its legislative enactment against a facial challenge may be carried by pointing to the enactment itself and its legislative history. These are "legislative facts," the substance of which cannot be trumped by the fact finding apparatus of a single court. While a party challenging an ordinance can point to other factors not considered by the legislature to demonstrate that the legislature acted irrationally, it cannot subject legislative findings themselves to judicial review under a clearly erroneous standard or otherwise. To do so would ignore the structural separation between legislative bodies and courts and would improperly subordinate one branch to the other.
 
 
 104
 Anheuser-Busch, Inc. v. Schmoke, 63 F.3d 1305, 1312 (4th Cir.1995), vacated on other grounds, 517 U.S. 1206, 116 S.Ct. 1821, 134 L.Ed.2d 927 (1996); accord Dunagin v. City of Oxford, 718 F.2d 738, 748 n. 8 (5th Cir.1983) ("In the first place, the issue of whether there is a correlation between advertising and consumption is a legislative and not an adjudicative fact question. . . . The specific issue here was undoubtedly considered by the Mississippi Legislature when local option and the curtailment of liquor consumption were being studied. Now the issue has moved to the judicial stage. If the legislative decision is not binding at this stage, at least it carries great weight. Certainly it cannot be thrust aside by two experts and a judicial trier of fact.").
 
 
 105
 The overarching principle is clear: "When Congress makes findings on essentially factual issues . . . those findings are of course entitled to a great deal of deference, inasmuch as Congress is an institution better equipped to amass and evaluate the vast amounts of data bearing on such an issue." Walters v. Nat'l Ass'n of Radiation Survivors, 473 U.S. 305, 331 n. 12, 105 S.Ct. 3180, 87 L.Ed.2d 220 (1985). When deciding constitutional questions, courts "must be particularly careful not to substitute . . . [their] own evaluation of the evidence for a reasonable evaluation by the Legislative Branch." Rostker v. Goldberg, 453 U.S. 57, 68, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981). We owe Congress deference not only "out of respect for [its] authority to exercise the legislative power," but also because Congress possesses an institutional competency over the judiciary, as it "is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions." Turner v. FCC, 520 U.S. 180, 195-96, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (Turner II); see also United States v. Gainey, 380 U.S. 63, 67, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965) ("[I]n matters not within specialized judicial competence or completely commonplace, significant weight should be accorded the capacity of Congress to amass the stuff of actual experience and cull conclusions from it.").
 
 
 106
 Obviously, the deference owed to Congress is strongest in cases involving rational basis review. As the Supreme Court noted, generally "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." See Vance v. Bradley, 440 U.S. 93, 111, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979); see also Lange-Kessler v. Dep't of Educ., 109 F.3d 137, 140 (2d Cir.1997) ("A statute regulating a profession is presumed to have a rational basis unless the plaintiff shows that `the legislative facts upon which the [statute] is apparently based could not reasonably be conceived to be true by the governmental decisionmaker.'" (quoting Vance, 440 U.S. at 111, 99 S.Ct. 939)).
 
 
 107
 Even in cases not subject to rational basis review, the Supreme Court has required deference to the legislative judgment reached by Congress if it is supported by "substantial evidence." In Turner v. FCC, cable television operators challenged the constitutionality under the First Amendment of a provision of the Consumer Protection and Competition Act of 1992 that required carriage of local broadcast stations on their cable systems (the "must-carry provisions"). 512 U.S. 622, 630-635, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (Turner I). The Court held that the must-carry provisions were subject to the intermediate level of scrutiny "applicable to content-neutral restrictions that impose an incidental burden on speech." Id. at 662, 114 S.Ct. 2445. After a remand to determine factual issues, the Court upheld the must-carry provisions and deferred to Congress's determination that must-carry was necessary to protect the economic health of local broadcasters. Turner II, 520 U.S. at 224, 117 S.Ct. 1174. With respect to Congress's determination that must-carry was necessary, the Court stated, "In reviewing the constitutionality of a statute, courts must accord substantial deference to the predictive judgments of Congress. Our sole obligation is to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence." Id. at 195, 117 S.Ct. 1174 (internal citations and quotation marks omitted). Moreover, the relevant question for the Court was not "whether Congress, as an objective matter, was correct to determine must-carry [was] necessary," but rather "whether the legislative conclusion was reasonable and supported by substantial evidence in the record before Congress." Id. at 211, 117 S.Ct. 1174. The Court emphasized that the "Constitution gives to Congress the role of weighing conflicting evidence in the legislative process," id. at 199, 117 S.Ct. 1174, and that it was not for the Court to "reweigh the evidence de novo,. . . replace Congress' factual predictions with [its] own," or "substitute [its] judgment for the reasonable conclusion of a legislative body," id. at 211-12, 117 S.Ct. 1174.
 
 
 108
 Deference to Congress's legislative conclusions has not been confined to cases involving the First Amendment. In Katzenbach v. Morgan, the Supreme Court considered section 4(e) of the Voting Rights Act, which prohibited the enforcement of a New York law requiring the ability to read and write English as a condition of voting. 384 U.S. 641, 643-44, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966). The issue was whether Congress could "prohibit the enforcement of the state law by legislating under § 5 of the Fourteenth Amendment" as "appropriate legislation to enforce the Equal Protection Clause." Id. at 649-50, 86 S.Ct. 1717. In holding that section 4(e) was "appropriate" to enforce the Equal Protection Clause, the Court deferred to Congress's judgment that the New York law denied the right to vote to large segments of New York's Puerto Rican community:
 
 
 109
 It was for Congress, as the branch that made this judgment, to assess and weigh the various conflicting considerations — the risk or pervasiveness of the discrimination in governmental services, the effectiveness of eliminating the state restriction on the right to vote as a means of dealing with the evil, the adequacy or availability of alternative remedies, and the nature and significance of the state interests that would be affected by the nullification of the English literacy requirement as applied to residents who have successfully completed the sixth grade in a Puerto Rican school. It is not for us to review the congressional resolution of these factors. It is enough that we be able to perceive a basis upon which the Congress might resolve the conflict as it did.
 
 
 110
 Id. at 653, 86 S.Ct. 1717 (emphasis added); see also Fullilove v. Klutznick, 448 U.S. 448, 472-73, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (discussing the deference owed to Congress and stating: "[W]e are bound to approach our task with appropriate deference to the Congress, a co-equal branch charged by the Constitution with the power to `provide for the . . . general Welfare of the United States' . . . . Here we pass, not on a choice made by a single judge or a school board, but on a considered decision of the Congress and the President. However, in no sense does that render it immune from judicial scrutiny, and it `is not to say we "defer" to the judgment of the Congress . . . on a constitutional question,' or that we would hesitate to invoke the Constitution should we determine that Congress has overstepped the bounds of its constitutional power.").
 
 
 111
 These principles have also been applied in challenges under the equal protection and due process clauses where the legislation involved medical and scientific judgments. See Marshall v. United States, 414 U.S. 417, 427-30, 94 S.Ct. 700, 38 L.Ed.2d 618 (1974) (rejecting equal protection challenge to statute mandating incarceration, as opposed to treatment, for drug addicts with two or more felony convictions, based on Congress's finding that such individuals were less likely to be rehabilitated); see also Jones v. United States, 463 U.S. 354, 366, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983) (rejecting due process challenge to scheme providing for indefinite civil commitment to defendants found not guilty by reason of insanity despite the lack of empirical evidence supporting the legislature's decision); Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 31-34, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) (rejecting due process challenge to statute barring the denial of coal miners' claims for disability benefits solely on the basis of a chest x-ray that is negative for a particular medical condition).
 
 
 112
 I recognize that the Supreme Court's abortion jurisprudence does not involve rational basis review, or even the kind of intermediate scrutiny that led the Turner Court to apply the "substantial evidence" standard to congressional factfinding. At the same time, there is no reason that the overarching and fundamental principle of deference to congressional factfinding — both as a matter of respect for the lawmaking power and as a matter of institutional competence — should not apply in the context of regulating the methods of abortion. Congress has a legitimate interest in regulating medical techniques of abortion. "[A] state may properly assert important interests in safeguarding health, in maintaining medical standards, and in protecting potential life." Roe v. Wade, 410 U.S. 113, 154, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Indeed, in Roe, the Court not only reaffirmed the State's "legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that insure maximum safety for the patient," but it specifically noted that, because "the risk to the woman increases as her pregnancy continues[,] . . . the State retains a definite interest in protecting the woman's own health and safety when an abortion is proposed at a late stage of pregnancy." Id. at 150, 93 S.Ct. 705.
 
 
 113
 In this case, Congress has made specific findings, including that the D & X procedure "is never necessary to preserve the health of a woman" and that it "poses serious risks to a woman's health." Partial Birth Abortion Ban Act, § 2(13), 117 Stat. at 1203-04. In making these findings, Congress did not challenge or otherwise dispute that Stenberg controls as a matter of constitutional law. See id. § 2(1)-(7), 117 Stat. at 1201-02. While Congress may not invade the Supreme Court's province of interpreting the Constitution, it is not so bound by the Court's determination of facts that have relevance beyond a particular case. Whether a particular medical procedure is safe, necessary, or risky is a question of fact that has a definite answer. Based on Congress's institutional competence over the judiciary with respect to such legislative facts, I believe that we owe Congress at least some level of deference when it makes these determinations. At a minimum, we should be required to consider those findings and how they may affect the constitutionality of the partial-birth abortion ban.
 
 2.
 
 114
 Congress made the following relevant findings: (1) D & X was "unnecessary to preserve the health of the mother"; (2) D & X "poses serious risks to the health of a woman undergoing the procedure"; (3) "[t]here is no credible medical evidence that [D & X procedures] are safe or are safer than other abortion procedures"; (4) no expert, including the doctor who invented the procedure, has been able to "identif[y] a single circumstance during which a partial-birth abortion was necessary to preserve the health of a woman"; and (5) "[a] ban on [D & X] will therefore advance the health interests of pregnant women seeking to terminate a pregnancy." Partial-Birth Abortion Ban Act § 2(2), (14)(A)-(F), 117 Stat. at 1201, 1204-05. In the discussion above, I have focused on the general principle of deference to Congress's fact-finding, rather than any specific standard of review, because these findings are well supported and worthy of deference under any standard.
 
 
 115
 The evidence in the congressional record solidly supports Congress's conclusion that no medical circumstance requires a D & X to protect a woman's health. Numerous doctors testified before, or provided letters to, Congress that, in their experience, they have never had a patient who required the D & X procedure. See, e.g., The Partial-Birth Abortion Ban Act of 1995: Hearing on H.R. 1833 Before the House Comm. on the Judiciary, 104th Cong. 109 (1995) (hereinafter "1995 House Hearings") (Statement of Dr. Nancy Romer) ("I have never had a patient who required the [D & X] procedure for maternal illness or fetal malformations."); The Partial-Birth Abortion Ban Act of 2002: Hearing on H.R. 4965 Before the Subcomm. on the Const. of the House Comm. on the Judiciary, 107th Cong. 26 (2002) (hereinafter "2002 House Hearings") (Statement of Dr. Curtis Cook) ("Never in the more than 10 years that I have been providing perinatal care to women with complicated pregnancies have I ever experienced a single clinical situation where the late-term abortion procedure being considered before this Committee has ever been required or even considered a superior option clinically to other well-known and readily available medical and surgical options."); Partial-Birth Abortion Ban Act of 2003: Hearing on H.R. 760 Before the Subcomm. on the Const. of the H. Comm. of the Judiciary, 108th Cong. 107 (2003) (hereinafter "2003 House Hearings") (Letter from Dr. Byron C. Calhoun) ("In my over 14 years as a Maternal-Fetal Medicine specialist I have never used or needed the [D & X] technique to care for my complicated or life threatening conditions that require the termination of a pregnancy."); id. at 110 (Letter from Dr. T. Murphy Goodwin) ("I have not encountered a case in which what has been described as partial-birth abortion is the only choice, or even the better choice among alternatives, for managing a given complication of pregnancy."); id. at 117 (Letter from Dr. Lewis Marola) ("Never, ever, in our years of practice have we seen a situation which warrants implementation of [D & X].").
 
 
 116
 Other sources before Congress confirmed these doctors' experience, indicating that there are no circumstances in which the D & X procedure would be necessary to preserve the health of the mother. See, e.g., 2002 House Hearings, supra, at 86-87 (Diane, M. Gianelli, Outlawing Abortion Method, American Medical News, Nov. 20, 1995, at 3) (reporting that Dr. Hern, author of Abortion Practice, a "widely used textbook," "could not imagine a circumstance in which this procedure would be safest"); see also 2003 House Hearings, supra, at 7 (Statement of Dr. Mark G. Neerhof) ("None of these risks are medically necessary because other procedures are available to physicians who deem it necessary to perform an abortion late in pregnancy."); id. at 105 (Letter from Dr. Watson Bowes) (stating that based on his experience with high-risk and complicated pregnancies, D & X "is not the only option for terminating these pregnancies in the safest possible manner"); id. at 106 (Letter from Dr. Nathan Hoeldtke) (writing that he could not "imagine" any case where "an intact D & X [would] be medically necessary"); id. at 146 (American Medical Association ("AMA") Fact Sheet) ("AMA's expert panel, which included a ACOG representative, could not find `any' identified circumstance where [D & X] was `the only appropriate alternative.'"). While the American College of Obstetricians and Gynecologists ("ACOG") contended that D & X "may be the best or most appropriate procedure" in an unspecified "particular circumstance," its assertion was wholly speculative; "[a] select panel convened by ACOG could identify no circumstances under which this procedure. . . would be the only option to save the life or preserve the health of the woman." 2003 House Hearings, supra, at 200 (ACOG Statement of Policy).[13]
 
 
 117
 Evidence in the congressional record further indicated that, even in an emergency, D & X is not appropriate or medically necessary. See, e.g., 2002 House Hearings, supra, at 8 (Statement of Dr. Kathi Aultman) ("In an emergency situation, when immediate delivery is necessary, D & X would not be used because it would take too long."); see also 2003 House Hearings, supra, at 97 (Summary of Testimony of Dr. William Cashore Before the Health & Welfare Comm. of the R.I. State S.) ("The 1-3 day period of cervical preparation . . . belies the `emergency' nature of the procedure."); id. at 114 (Letter from Dr. Camilla C. Hersh) ("In the event of a truly life threatening complication of pregnancy, the days of delay involved substantially add to the risk of loss of life of the mother.").
 
 
 118
 It is undisputed that no peer-reviewed studies or data exists showing that D & X is either safe or safer than other abortion procedures. 2002 House Hearings, supra, at 8 (Statement of Dr. Kathi Aultman) ("There have been no peer reviewed controlled studies that have looked at the benefits and risks of D & X as compared to D & E, Induction, Delivery, or C-Section. We do not have adequate data on its mortality or morbidity."); id. at 244 (ACOG Policy Statement Regarding Intact Dilation and Extraction) ("ACOG is unaware of any comparative maternal morbidity studies specifically evaluating Intact D & E procedures with other methods of abortion."); see also H.R.Rep. No. 108-58, at 16 n.80 (2003) (noting that ACOG's president acknowledged that "[t]here are no data to say that one of the procedures is safer than the other"). Testimony before Congress also questioned the extent to which D & X procedures had been monitored and had gained acceptance as a legitimate medical practice. See 2003 House Hearings, supra, at 92 (Testimony of Dr. Curtis R. Cook) ("There is no record of these procedures in any medical text, journals, or on-line medical service. There is no known quality assurance, credentialing, or other standard assessment usually associated with newly-described surgical techniques. Neither the CDC nor the Alan Guttmacher Institute have any data on partial-birth abortion . . . ."); id. at 146 (AMA Fact Sheet) ("Intact D & X is not an accepted `medical practice' . . . . It has never been subject to even a minimal amount of the normal medical practice development.").
 
 
 119
 The District Court's own findings support Congress's findings that D & X is never medically necessary and not safer than other safe abortion procedures. The District Court did "not believe that many of Plaintiffs' purported reasons for why D & X is medically necessary are credible; rather they are theoretical or false." N.A.F., 330 F.Supp.2d at 480. Furthermore, it found that "[t]he Government's experts, especially, Dr. Clark, demonstrated that some of Plaintiffs' reasons necessitating D & X are incoherent; other reasons were shown to be merely theoretical." Id. at 479-80.
 
 
 120
 The District Court was correct in finding that no evidence supported the necessity of D & X. As an initial matter, the evidence showed that very rarely does preserving a woman's health ever require an abortion. See Trial Tr. at 352 (Dr. Grunebaum testifying that it was "rare" that pregnancies are terminated because of a serious medical condition); id. at 1743 (Dr. Lockwood testifying that it was rare that maternal health would require an abortion prior to viability); id. at 2315 (Dr. Clark testifying that such situations were "very rare"). The testimony of the government's witnesses supports the contention that in the rare case where maternal health might require an abortion, D & X was never necessary to preserve the woman's health. See id. at 1760 (Dr. Lockwood could not think of any circumstance where D & X would be necessary to preserve maternal health); id. at 2311 (Dr. Clark testifying that "[u]nder no circumstances is D & X abortion necessary to preserve the life or health of the mother. . . . Under no circumstances would the abolition of this procedure in any way jeopardize the life or health of any mother regardless of what medical conditions she may have."); id. at 2313 (Dr. Clark testifying that "I can't imagine any medical condition . . . in which this D & X procedure might be helpful to me, as someone who spent my life caring for critically ill women, in which it might be helpful to me in preserving the life or health or well-being of the mother. I can't come up with one.").
 
 
 121
 Furthermore, the plaintiffs and their experts agreed that they had never encountered a situation where D & X was the only available procedure or where the mother's health required a D & X. See id. at 261 (Dr. Grunebaum responding "[a]bsolutely not" to the question of whether D & X is "the only method available for performing abortions in any given circumstance"); id. at 491 (Dr. Johnson testifying that "I don't believe there is ever a condition where [D & X] would be the only procedure that would be available or an option to perform" and agreeing with the government's statement that there was no "maternal complication that would either require [D & X] or make [D & X] the only procedure to be performed"); id. at 1369 (Dr. Weiss stating that he could not "think of a circumstance where it would be required to do an [D & X] for a maternal health condition"); id. at 1683 (Dr. Chasen agreeing that his study showed that D & X "is rarely used in cases of a maternal medical problem").
 
 
 122
 When maternal health requires an abortion, D & E and induction are safe, scientifically established, and appropriate methods. See id. at 541-42 (Dr. Hammond testifying that between 20 and 24 weeks' gestation both D & E and induction are "very safe method[s] of terminating pregnancy" and that through "nearly 30 years of data . . . D & E has repetitively been shown to be a very safe procedure"); id. at 1682-83 (Dr. Chasen agreeing that D & E and induction are safe procedures); id. at 1743 (Dr. Lockwood testifying that induction is a safe and accepted method of abortion at 20 to 24 weeks' gestation); id. at 1746 (Dr. Lockwood testifying that D & E's safety has been shown in the scientific and medical literature based on various kinds of studies); id. at 2313 (Dr. Clark testifying that D & E and induction are available methods of abortion in the second trimester that may be used to safely terminate a pregnancy of a woman who is experiencing a maternal medical complication); id. at 2387 (Dr. Clark testifying that D & E "is in fact a documented, incredibly safe procedure in huge numbers of patients" and that "it is very difficult to imagine that there could be any procedure which is safer than [D & E]").
 
 
 123
 The District Court correctly found that the plaintiffs failed to prove that D & X has safety advantages over D & E. The plaintiffs failed to substantiate that D & X involved fewer instrument passes. The plaintiffs were unable to say how many instrument passes occurred in D & X as opposed to D & E. Multiple instrument passes are common to both procedures. There was no evidence showing that fewer passes of the forceps increased maternal risk, and the plaintiffs conceded that risk of injury from forceps is very low. See, e.g., Pl.'s Ex. 6 (NAF Fact Sheet explaining that uterine perforation in surgical D & E abortions occurs in "less than 1/2 of 1% of cases"). Plaintiffs failed to establish that D & X reduced the risk of injury from fetal bone fragments. Laceration from bony parts is no more than a "very, very theoretic possibility." Trial Tr. at 2114-15 (Dr. Sprang).
 
 
 124
 The plaintiffs failed to establish that D & X lessened the chance of retained fetal parts. As the trial evidence showed, it is an essential part of D & E to ensure that all fetal parts have been removed from the uterus. Performing suction curettage of the uterus at the end of the procedure also helps ensure that all parts have been removed. No evidence supports the assertion that D & X takes less time and involves less blood loss than D & E. Dr. Chasen testified that there was no difference between the two procedures in either procedure time or blood loss. The District Court was correct that the Chasen study fails to support any of the claimed safety advantages of D & X. The Chasen Study found no difference in blood loss or procedure time between D & X and D & E. The two procedures have "similar" complication rates. Dr. Chasen admitted that the study did not prove that D & X is superior to D & E. He also testified that the study could not claim that D & X was "as safe as" D & E.
 
 
 125
 The study showed that for the small group of women for whom subsequent pregnancy information was available, spontaneous birth occurred in 2 of 17 (11.8%) of the D & X group, and 2 of 45 (4.4%) of the D & E group. Although this difference may be statistically insignificant given the few patients in the study, it was sufficient to signal a cause for concern for some of the experts. The study also showed that the D & X group experienced a higher rate of cervical laceration (2.4%) than the D & E group (.8%). Dr. Sprang derived this number from the data in the Chasen study. While the sample size was too small to be statistically significant, it "tends to show that D & X has the potential to cause more trauma to the cervix." Trial Tr. at 2125.
 
 
 126
 In sum, Congress had before it compelling evidence, confirmed by the District Court, that the D & X procedure is never medically necessary and that there is a lack of credible evidence in support of the procedure. The trial evidence supports Congress's judgment that no maternal health condition required the use of D & X. Nor is D & X preferable or safer than D & E in any particular circumstance. The alleged safety advantages are wholly unproven and hypothetical, and, to quote the pithy phrase of the District Court, "Intuition does not equate to scientific fact." Nat'l Abortion Fed'n v. Ashcroft, 330 F.Supp.2d 436, 480 (S.D.N.Y.2004) (N.A.F.).
 
 
 127
 In the final analysis, at least three of the "medically related evidentiary circumstances" present in Stenberg are wholly absent in this case. The District Court was correct that the government disproved that "D & X significantly obviates health risks in certain circumstances." Instead of a "highly plausible record-based explanation of why" D & X might obviate health risks, the District Court correctly found that the proposed benefits of D & X were "theoretical," "hypothetical," or "false." Although there are still no definitive studies resolving the issue, the Chasen study failed to prove that D & X obviated any health risk, was "as safe as" D & E, and signaled the possibility of potential health risks.
 
 
 128
 Rather than defer to, or even consider, these finding by Congress, the District Court and the majority hold that D & X's ultimate medical necessity is not the issue — that the issue is simply whether D & X is supported by "substantial medical authority," which has been equated to a "division of medical opinion." In my view, the framing of the issue by the District Court and the majority is not required by Stenberg and distorts not only the constitutional balance between Congress and the Court, but also the balance between the interests of women in terminating their pregnancies and of the State in regulating as "gruesome and inhumane" a procedure as D & X.
 
 II.
 
 129
 For the sake of completeness, I would also reject all of the plaintiffs' other arguments for holding the statute unconstitutional.
 
 
 130
 The Act does not impose an undue burden on a woman's right prior to viability to terminate her pregnancy. Specifically, the requirement that the physician "deliberately and intentionally" deliver the living fetus to one of the specified anatomic landmarks "for the purpose of performing an overt act," 18 U.S.C. § 1531(b) (1)(A), requires that the physician "consciously desire" to violate the Act. See United States v. Townsend, 987 F.2d 927, 930 (2d Cir. 1993) (stating that the terms "deliberately" and "intentionally" are synonyms of the more common mens rea term "purposefully"); see also United States v. Bailey, 444 U.S. 394, 404, 100 S.Ct. 624, 62 L.Ed.2d 575 (1980) ("[A] person who causes a particular result is said to act purposefully if he consciously desires the result happening from his conduct . . . ." (internal quotation marks omitted)). In a D & E, the physician intends to dismember the fetus and remove the pieces and not to deliver the fetus to either of the anatomical landmarks for the purpose of committing an overt act that the fetus cannot survive. See Carhart v. Ashcroft, 331 F.Supp.2d 805, 1033 (D.Neb.2004), aff'd sub nom. Carhart v. Gonzales, 413 F.3d 791 (8th Cir.2005), petition for cert. filed, No. 05-380 (Sept. 23, 2005). Moreover, if due to complications during a D & E procedure, the fetal head is crushed, disarticulated, or even pierced and suctioned while it is within the mother's body, the Act is not violated unless the physician began the procedure with a conscious desire to do so. See id. at 1033 ("[U]nless a physician begins a particular abortion with a pre-meditated and specific intent to perform the abortion in the manner the Act forbids, the physician has not acted in violation of the statute, even if it so happens, as he or she proceeds, that the fetus's head gets stuck and must be crushed, or its contents removed, to complete the delivery.").
 
 
 131
 For the same reason, I would also hold that the act is not vague. See Hill v. Colorado, 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000) (holding that a statute was not vague as it contained the intent requirement that the violation be "knowing"). Finally, the Act's life exception is constitutional. The word "necessary" in the statute has the same meaning as it does in the phrase "necessary, in appropriate medical judgment, for the preservation of the life . . . of the mother." Stenberg v. Carhart, 530 U.S. 914, 921, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) (quoting Planned Parenthood of Southeastern Penn. v. Casey, 505 U.S. 833, 879, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)); see also Simopoulos v. Virginia, 462 U.S. 506, 510 n. 2, 103 S.Ct. 2532, 76 L.Ed.2d 755 (1983) (affirming conviction under abortion statute that contained the same life exception).
 
 III.
 
 132
 I believe that there are important differences between the Nebraska statute at issue in Stenberg and the Act that remove the latter from the ambit of Stenberg's holding and require a new assessment of the competing interests that the Supreme Court identified in Roe and Casey.
 
 
 133
 The first significant difference between the two statutes is that the Act proscribes the destruction of the fetus at a location later than the one considered by the Court in Stenberg. The Nebraska statute criminalized "partial-birth abortions" that could have occurred completely within the body of the mother. See Neb.Rev.Stat. Ann. § 28-328(1) (Supp.1999) (prohibiting a physician from "deliberately and intentionally delivering into the vagina a living unborn child, or a substantial portion thereof, for the purpose of performing a procedure that the person performing such procedure knows will kill the unborn child and does kill the unborn child" (emphasis added)), quoted in Stenberg, 530 U.S. at 922, 120 S.Ct. 2597; see also Carhart v. Stenberg, 11 F.Supp.2d 1099, 1118 (D.Neb. 1998) (medical expert testifying that "the phrase `delivering into the vagina a living unborn child' in the definition of `partial-birth abortion' . . . mean[s] to `pull the fetus [from within the uterus and through the cervix and] down into the vagina,' but not necessarily outside of the woman's body'"), aff'd, 192 F.3d 1142 (8th Cir.1999), aff'd, 530 U.S. 914, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). In this respect, the Nebraska statute impacted not only a woman's fundamental liberty and autonomy concerning the "decision whether to bear or beget a child," Casey, 505 U.S. at 851, 112 S.Ct. 2791, but also the very "integrity" of her body, id. at 896, 112 S.Ct. 2791.
 
 
 134
 The Act has a more narrow scope and prohibits only an "abortion" that occurs when a substantial part of the fetus "is outside the body of the mother." 18 U.S.C. § 1531(b)(1)(A). Once a fetus is "born," i.e. crosses the threshold between its mother's womb and the outside world, it is a "person" and entitled to all constitutional protections. See Lewis v. Thompson, 252 F.3d 567, 585-86 (2d Cir.2001). Although under Roe, a fetus in utero is not a "person" entitled to the protections afforded by the Fourteenth Amendment, Lewis, 252 F.3d at 585, when the fetus leaves the body of its mother, it may not be "deprive[d] . . . of life . . . without due process of law," U.S. Const. amend. XIV, § 1. At this point, the mother's right to privacy, autonomy, and bodily integrity are waning in importance, and the fetus's increases in strength. Just as viability is the point during the gestation of the fetus when the interest of the State in potential life become paramount, see Casey, 505 U.S. at 869, 112 S.Ct. 2791, birth[14] is the point during gestation when the State's "unqualified interest in the preservation of human life," Washington v. Glucksberg, 521 U.S. 702, 728, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997), and the child's right to life have sufficient force to restrict the privacy and autonomy rights of a woman.
 
 
 135
 At birth, we are, therefore, confronted with a unique circumstance where we must weigh the relative strength of the mother's privacy right, specifically her right to terminate her pregnancy in a manner that preserves her own health, against the emerging right of the fetus to live and the State's interest in protecting life. As Stenberg involved the destruction of a fetus while completely internal to the mother's body, I do not believe that it squarely confronted this issue of the conflict between these interests. Although I acknowledge that no court has held that there is a special constitutional standard of protection for the fetus in the process of being born, a woman's right to terminate a pregnancy has never extended to the destruction of a child during parturition. See Roe, 410 U.S. at 117 n. 1, 93 S.Ct. 705 (stating that the Texas parturition Statute was "not attacked"). We should consider independently whether providing an unknown number of women a marginal health benefit outweighs both the fetus's emerging right to life and the State's interests in protecting actual and potential life.
 
 
 136
 In addition to vindicating the right to life of those in the process of being born, the State has a compelling interest in protecting the line between abortion and infanticide — the second significant difference from the Nebraska statute. Congress, inter alia, found that partial-birth abortion "blurs the line between abortion and infanticide," Partial-Birth Abortion Ban § (2)(14)(O), 117 Stat. at 1206, and that failing to prohibit the practice would "coarsen society to the humanity of not only newborns, but all vulnerable and innocent human life," id. § (2)(14)(N). There is undoubtedly a compelling state interest in preventing the killing of newborns. Infanticide, like suicide, is a "serious public-health problem," which the State has an interest in "studying, identifying, and treating its causes." Glucksberg, 521 U.S. at 730, 117 S.Ct. 2258. This horrific crime occurs in the United States and throughout the world with alarming frequency. See, e.g., Amy D. Wills, Neonaticide: the Necessity of Syndrome Evidence When Safe Haven Legislation Falls Short, 77 Temp. L.Rev. 1001, 1004 (2004) (noting that 250 homicides a year involve infants being killed within the first twenty-four hours of life); see also Parents of Dead Infant Sought, Chi. Sun Times, Jan. 16, 2006, at 14 (reporting that a newborn was found dead in a trash bin).
 
 
 137
 The majority offers the definition in 1 U.S.C. § 8(a) of "born alive" for the proposition that Congress has already drawn "a line" against infanticide. While the statute includes infants that have been "complete[ly] expel[led] or extract[ed] from his or her mother," it does not exclude humans at a prior stage of development from the term. Indeed, Congress specifically provided that "[n]othing in this section shall be construed to affirm, deny, expand, or contract any legal status or legal right applicable to any member of the species homo sapiens at any point prior to being `born alive.'" Id. § 8(c). Regardless of whether a partial-birth abortion terminates the life of a statutory "person," allowing a physician to destroy a child as long as one toe remains within the mother would place society on the path towards condoning infanticide. Preventing the death of an infant in the process of being born safeguards those infants who have been completely separated from their mothers.
 
 
 138
 I find the current expansion of the right to terminate a pregnancy to cover a child in the process of being born morally, ethically, and legally unacceptable.
 
 IV. Conclusion
 
 139
 Congress's determination that D & X is never medically necessary to protect a woman's health was well founded and supported by the District Court's opinion. Additionally, I do not believe that the right to terminate a pregnancy extends to the destruction of a partially born fetus or overrides the State's compelling interest in preventing infanticide. As none of the arguments advanced by the plaintiffs convinces me that the Act is unconstitutional, I do not believe that Ayotte v. Planned Parenthood of N. New England, ___ U.S. ___, 126 S.Ct. 961, ___ L.Ed.2d ___ (2006) is applicable. I understand, however, that based on the majority's finding that the Act is unconstitutional, it is appropriate for the majority to request further briefing from the parties on the proper remedy.
 
 
 140
 I respectfully dissent.
 
 
 
 Notes:
 
 
 [11]
 Chief Judge Walker in his lucid concurring opinion believes that I have overstated theStenberg Court's reliance on the district court's findings. See ante at [6 n. 2]. Although the Supreme Court took notice of facts other than those found by the district court, there can be no doubt that at least two of the four "medically related evidentiary circumstances" that mandated the inclusion of a health exception were based on the lower court's factual findings. See Stenberg, 530 U.S. at 936-37, 120 S.Ct. 2597. It is undeniable that neither of these circumstances are present in the record before this Court, and both are necessary, under Stenberg, for us to hold that the Act requires a health exception.
 Moreover, it is irrelevant that the text of the Act was introduced prior to the hearings. As discussed infra, it was within Congress's factfinding power to determine the benefits and harms that would be caused by enacting a ban on a particular medical procedure, and we owe deference to that determination as it is supported by the Congressional record and the District Court's findings. We are not empowered to review Congress's internal procedures or methods — so long as they are in accord with the Constitution — any more than Congress may dictate the manner in which we write our opinions. U.S. Const. art. I, § 5, cl. 2 ("Each House may determine the Rules of its Proceedings . . . ."); see United States v. Ballin, 144 U.S. 1, 5, 12 S.Ct. 507, 36 L.Ed. 321 (1892); see generally Lawrence H. Tribe, American Constitutional Law § 4-13, at 267 (2d.1988) (noting that on matters of "legislative self-governance . . . the Constitution expressly makes each house a law unto itself").
 
 
 [12]
 The Supreme Court's recent decision inAyotte v. Planned Parenthood of Northern New England affects only the remedial aspect of this case and not the substantive law. See ___ U.S. ___, ___ U.S. ___, 126 S.Ct. 961, 964, ___ L.Ed.2d ___ (2006) ("We do not revisit our abortion precedents today, but rather address a question of remedy."). I do not read Ayotte or the majority opinion to stand for the proposition that a statute regardless of its text and purpose must include an explicit health exception.
 Ayotte considered whether the judicial bypass provision of a statute that prevented minors' access to any type of abortion without notice to their parents or guardians was constitutionally sufficient to protect the health of the mother. See id. at 964-65. New Hampshire conceded that a very small percentage of pregnant minors would "need immediate abortions to avert serious and often irreversible damage to their health." Id. at 967. The government, in this case, has not made such a concession. Unlike the New Hampshire statute, see id. at 964-65, the Act does not regulate access to all methods of abortion. As women would have unfettered, immediate access to induction and D & E, methods of abortions that have been proven to be safe, scientifically established, and available, see infra Part I.A.2, there is no requirement that the Act contain a health exception.
 
 
 [13]
 One physician, Dr. Philip Darney, identified a situation where D & X was "critical to providing optimal care" in what he suggested were two "life-threatening circumstances" of bleeding placenta previa and placenta accreta2003 House Hearings, supra, at 100-01 (Letter from Dr. Phillip D. Darney). His testimony was thoroughly discredited by seven physicians specializing in maternal fetal medicine or high-risk obstetrics. All seven disputed Dr. Darney's conclusions and some stated that not only was performing a D & X unusual and unnecessary, but also doing so put the patients at serious risk of grave harm. See, e.g., id. at 105 (Letter from Dr. Steve Calvin); id. at 107 (Letter from Dr. Byron C. Calhoun); id. at 109 (Letter from Dr. T. Murphy Goodwin); id. at 111 (Letter from Dr. Susan E. Rutherford).
 
 
 [14]
 Some argue that the removal of a fetus during a D & X is not "birth."See Farmer v. Planned Parenthood of Cent. N.J., 220 F.3d 127, 143 (3d Cir.2000). However, "birth" is the "passage of the offspring from the uterus to the outside world." Dorlands Illustrated Medical Dictionary 207 (27th ed.2000). The removal of a fetus from its mother surgically does not mean that it is not born, as a fetus removed from its mother via a cesarean section is certainly "born." Moreover, I disagree with the contention of the Farmer court that the intent of the mother governs whether a child is born or aborted. See Farmer, 220 F.3d at 144. A child born prematurely, even though its mother does not intend it to be born, is not necessarily an abortion. Indeed, the statute that the majority relies on for its definition of a "person" defines "born alive" to include "any member of the species homo sapiens . . . regardless of whether the expulsion or extraction occurs as a result of natural or induced labor, cesarean section, or induced abortion." 1 U.S.C. § 8. If the intent of the mother controls the scope of her right to destroy her offspring, there is no reason why she should not be able to destroy the child after it has completely been separated from her body.
 I disagree with Chief Judge Walker that the fact that the Act is not limited to post-viability abortions necessarily vitiates the compelling interest of the State in preventing the procedure to distinguish abortion from infanticide. Once a fetus is born, its viability ceases to be relevant to determining the constitutional protections to which it is entitled.